**Terry SPADOLA, Plaintiff,**

v.

**NEW YORK CITY TRANSIT AUTHORITY and Manhattan and Bronx Surface Transit Operating Authority, Defendants.**

**No. 00 Civ.3262.**

United States District Court,
S.D. New York.

Jan. 10, 2003.

tended.").

Steve S. Efron, New York City, for Defendants.

## DECISION AND AMENDED ORDER

MARRERO, District Judge.

Plaintiff Terry Spadola ("Spadola") brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), against defendants New York City Transit Authority and Manhattan and Bronx Surface Transit Operating Authority (collectively the "Authority"). Spadola alleges that the Authority engaged in unlawful retaliation, through successive disciplinary proceedings that ultimately led to his dismissal, in response to his objecting to a comment, addressed to him by an Authority supervisor, that he regarded as sexual harassment. The Authority moved for summary judgment dismissing the action. By Order dated December 27, 2002, the Court granted the motion and indicated that its reasoning would be set forth in a separate Decision to be made available to the parties.

## I. FACTS

Spadola was employed by the Authority as a Line Supervisor at the Authority's bus maintenance depots from December 1980 until his termination in July of 1999. His duties included scheduling work orders, distributing assignments and checking work performed by employees he supervised.

### 1. *The July 27, 1997 Incident*

The incident Spadola alleges ultimately prompted his dismissal by the Authority, and that in his view served as the basis for subsequent disciplinary actions, occurred on July 27, 1997 (the "July 1997 Incident") at the Authority's 146th Street Depot where Spadola was then assigned. On that day, Authority Maintenance Superintendent Tina Washington ("Washington") was instructing another employee, Maintenance Superintendent William Bedford ("Bedford"), on the use of a new computer system known as MIDAS. In the course of the training session, Washington noted a possible duplication of work orders, authorized by Spadola, that had been entered into the computer. Washington was not Spadola's immediate supervisor and the two had not previously met. Spadola was called to the office, a small space measuring approximately six feet by nine feet, to explain the error. Bedford, who was Spadola's supervisor, and another contract employee were present when the encounter occurred.

By Spadola's account, Washington repeatedly questioned him about the duplicate work orders and he responded that he "had no idea what she was talking about." (Spadola Deposition ("Spadola Dep."), attached as Exhibit A to the Declaration of Steve S. Efron dated March 22, 2002 ("Efron Decl."), at 77.) When Washington's questioning became more persistent, Spadola replied: "I don't know, you're the instructor, I don't know, what are you asking me for, you figure it out." (*Id.*) Following more heated exchange, Spadola finally turned to leave, telling Washington: "Look, I don't have time for this." (*Id.* at 77–78.) At this point, according to Spadola

I was going outside the door and she called me, "Honey, sweetie, dear, come back." So I went back and I told her, "If you call me that again I will write you up for sexual harassment." She said, "If you don't take your finger out of my face I'm going to take you out of service."

(*Id.* at 78.)

Spadola contends that after the incident he spoke to Bedford, and asked whether he should prepare a written report, and that Bedford advised him to drop the mat-

ter. (Affidavit of Terry Spadola dated October 15, 2002 ("Spadola Aff.") ¶ 4.)

Washington submitted her version of the episode in a memorandum to the 146th Street Depot's Assistant General Manager, John Bolds ("Bolds"), in which she asserted that Spadola's conduct was irrational, unprofessional and threatening. (Efron Decl. Ex. E.) Bedford prepared his own report in which he confirmed that Spadola was agitated and pointed his finger in Washington's face. (*Id.*)

In his deposition in connection with this action, Spadola testified that following his encounter with Washington, he left the office feeling that "everything was fine" and had no intention to charge Washington with sexual harassment. (Spadola Dep. at 88–89.) Upon learning of the reports filed by Washington and Bedford, however, he reported the incident and his sexual harassment allegation to his union representative. (*Id.* at 88–89.) The union declined to bring the accusation to the Authority's attention. (*Id.* at 98–99.)

As a result of the July 1997 Incident, Bolds suspended Spadola from service on July 31, 1997 and charged him with several disciplinary infractions, specifically that:

1. when questioned by management regarding a computer error attributed to you, you responded in a loud and abusive manner;

2. in a threatening manner, you pointed your finger in a manager's face while continuing to be loud and abusive;

3. you threatened to bring false charges of sexual harassment against a member of management if you were taken out of service by that manager.

(Efron Decl. Ex. F.)

The charges were sustained following an administrative hearing conducted by Bolds during Step I and subsequently in Step II of the Authority's internal disciplinary grievance procedure. As a consequence, Bolds's recommendation that Spadola be discharged was deemed appropriate under the Authority's internal grievance procedures. Pursuant to the Authority's collective bargaining agreement, Spadola filed a grievance in an arbitration proceeding to appeal his dismissal.

In an Opinion and Award issued on October 17, 1997, arbitrator George Nicolau ("Nicolau") concluded that Spadola's behavior "was clearly inappropriate," but that the penalty of discharge was disproportionate under the circumstances. (Efron Decl. Ex. H, at 6.) He found that Spadola's statement regarding his filing of sexual harassment charges against Washington, whether ultimately vindicated or not, was "legally privileged" and thus could not serve as proper grounds for disciplinary action. (*Id.* at 7.) However, Nicolau ruled that Spadola's behavior otherwise was "generally uncooperative" and "not reasonably to be expected of one supervisor to another and was therefore conduct unbecoming his status." (*Id.*) Nicolau, noting evidence of "other episodes" of similar conduct in Spadola's employment record cited by the Authority, ruled that a three-week suspension was more appropriate. (*Id.*)

### 2. *The Overtime Charges*

In fact, about two weeks prior to the July 1997 Incident, the Authority had received another complaint of similar behavior by Spadola. The report was communicated in a memorandum dated July 15, 1997 from the supervisor of the City University ("CUNY") unit that administered the MIDAS training workshops. (Declaration of Michael A. Lendino dated March 21, 2002 ("Lendino Decl.") Ex. A.) The CUNY trainer alleged that during a training session Spadola had attended from

July 7 to July 9, 1997, Spadola had been excessively disruptive, uncooperative and unprofessional, and that on the second night of the workshop he left during a scheduled lunch break and did not return.

The report was referred for investigation by the Operations Analysis and Review ("OAR") division of the Authority's Office of Labor Relations ("OLR"). Because the CUNY trainer's report came to the Authority's attention less than two weeks before the July 27 Incident as a result of which Spadola had been suspended on July 31, the investigation of the training workshop episode coincided with part of the time during which Spadola was already under suspension. The OAR, finding conflicting accounts from participants and witnesses, was unable to substantiate the allegation that Spadola had acted inappropriately during the training session. However, in the course of investigating related allegations that Spadola had fraudulently claimed overtime for attending MIDAS sessions on July 10 and 11, 1997, OAR examined Spadola's time sheets and determined that he had intentionally filed false claims for overtime payments. The OAR report was issued on October 23, 1997. Spadola, who had just been reinstated to his position as a result of Nicolau's arbitration ruling on October 17, 1997, was again immediately suspended and charged with making fraudulent time sheet entries.

The false overtime charge was upheld during the Authority's Step I and Step II internal procedures and finalized on November 24, 1997. Prior to the conclusion of this proceeding, on or about November 14, 1997, Spadola filed a charge with the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights. In it, Spadola alleged that the disciplinary actions brought against him were motivated by racial discrimination and retaliation for his having complained of sexual harassment by a black employee.[1]

Spadola filed a grievance with regard to the improper overtime charges. The arbitration was conducted by Nicolau. In an Opinion and Award issued on March 3, 1998, Nicolau set aside the charges and ordered Spadola reinstated. Nicolau was not persuaded that Spadola could have intended to defraud the Authority by his method of making overtime entries. (Efron Decl. Ex. K.) He commented that the OAR investigation into the overtime charges was "unsettling and lends credence to the view that the Grievant was being targeted." (*Id.*)

### 3. Other Complaints

Spadola returned to work in March 1998. In the months that followed, Authority management received other complaints from fellow employees at the 146th Street Depot charging that Spadola had engaged in verbal altercations in which he used abusive language. Three such incidents were reported in March, August and September of 1998 but, following investigations by management, resulted in no disciplinary actions. (Efron Decl. Exs. M, N, O; Spadola Dep. at 136–56.)

### 4. The 1999 Incident

In 1999, Spadola elected to transfer his work station to the Authority's 207th Street Depot in Manhattan. In May 1999, the General Superintendent of that facility, Mark Schmid ("Schmid"), reassigned Spadola to work at the Authority's Gun Hill Road maintenance shop in the Bronx, allegedly because Spadola had experienced problems getting along with other employees at the 207th Street Depot. One or two days after receiving the new assignment,

---

1. In the course of the instant action Spadola  voluntarily withdrew his state law claims.

scheduled to commence as of May 17, Schmid directed Jose Felix ("Felix"), Spadola's replacement at the 207th Street Depot, to contact Spadola and request that he return the keys to his personal locker and to the tool box used by the employees he had supervised. (Spadola Dep. at 166–169.) Schmid also called the Superintendent of the Gun Hill facility to request that Spadola be directed to return the tool box key. (Deposition of Mark Schmid ("Schmid Dep."), attached as Exhibit B to the Efron Decl., at 97–104.) Spadola indicated that he would do so when he received a copy of the forms he signed for receipt of the tools.

More than two weeks later, after Spadola had failed to respond and had gone on vacation, Schmid instructed Felix to break the locks on the tool box and locker in the presence of witnesses. (*Id.*) Felix did so and packed Spadola's personal items. When Spadola, upon return from vacation, learned on June 2nd or 3rd that the tool box and locker had been opened, he traveled to the 207th Street Depot on June 4, 1999 to confront Felix. In front of several employees he used angry, abusive and threatening language, calling Felix a "coward", "liar", and "thief". (Spadola Dep. at 179–80.)

The incident was reported to Schmid, who obtained statements from witnesses and charged that Spadola

> used vulgar and abusive language towards a fellow supervisor. You further acted in a violently aggressive, threatening manner towards the supervisor, causing him fear of imminent harm which resulted in you having to be physically restrained.

(Lendino Decl. Ex. E.) Schmid concluded that these acts constituted gross misconduct and severe dereliction of duty. The Authority's OLR accepted Schmid's recommendation and determined that Spadola's conduct merited dismissal.

Spadola grieved the action. In an Award and Opinion dated July 29, 1999, arbitrator Carol Wittenberg ("Wittenberg") upheld the charges and ruled that Spadola's dismissal was warranted. (Lendino Decl. Ex. H.) She found that Spadola had provoked the confrontation and that his behavior "was clearly inappropriate. It was provocative, abusive, threatening and public...." (*Id.* at 7.) Finally, Wittenberg concluded that discharge was a fitting penalty because: "[g]iven [Spadola's] prior disciplinary history for similar misconduct, it appears that he is either unwilling or unable to conform his behavior to acceptable standards of conduct." *Id.* Spadola then commenced the action now before the Court.

## II. *DISCUSSION*

### A. *SUMMARY JUDGMENT STANDARD*

In considering a motion for summary judgment, a court may grant the motion only if, on the basis of the record of the pleadings, depositions, answers to interrogatories and admissions, together with any affidavits filed, it concludes that there is no genuine dispute as to any material fact and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68 (2d Cir.2000). The role of the court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

The moving party bears the initial burden of establishing the basis for the motion and identifying those portions of the mate-

rials on the record that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Koch v. Town of Brattleboro, Vermont,* 287 F.3d 162, 165 (2d Cir.2002). In this regard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In weighing whether the movant has satisfied this threshold, the court must view the record as a whole in the light most favorable to the opponent of the motion. *See id.* at 255, 106 S.Ct. 2505. The movant may meet this initial burden by demonstrating the absence of evidence sufficient to support an essential element of the opponent's underlying claim. *See LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998).

If the court finds that the moving party has satisfied his initial burden of persuasion, the opponent must then "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To this end, the opponent "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Rather, he must support with specific evidence his assertion that a genuine dispute as to material fact does exist. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Goenaga,* 51 F.3d at 18.

The opposing party's showing of a genuine dispute must be grounded on concrete evidence sufficient to support a reasonable jury's rendering a verdict in his favor. *See Anderson,* 477 U.S. at 248, 256, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient."); *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

## B.  *TITLE VII RETALIATION STANDARD*

Section 2000e–3(a) of Title VII provides that:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [such employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

42 U.S.C. § 2000e–3(a).

■ To prevail on a claim of retaliation under Title VII, a plaintiff must provide sufficient evidence to establish a *prima facie* case comprised of the following elements:  (1) participation in a protected activity;  (2) knowledge by the employer of the employee's protected activity;  (3) an adverse employment action;  and (4) a causal connection between the protected activity and the adverse employment action. *See Wimmer v. Suffolk County Police Dept.,* 176 F.3d 125, 134 (2d Cir.1999); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998); *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d.Cir.1993). The sufficiency of Title VII retaliation claims is assessed under the three-step burden shifting inquiry enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also Quinn,* 159 F.3d at 768–69 ("[T]he plaintiff must make out a *prima facie* case of retaliation .... the defendant then has the burden of articulating a legitimate non-retaliatory reason for the complained of action .... if the defendant meets its burden, plaintiff must adduce evidence 'sufficient to raise a fact

issue as to whether [the employer's] reason was merely a pretext' for retaliation.") (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1309 (2d Cir.1995)).

Spadola claims that the various disciplinary actions the Authority instituted against him were taken in retaliation for his threat to file a sexual harassment charge against Washington during the July 1997 Incident and his actual filing of such a charge in November 1997 with the EEOC. The Court is not persuaded that Spadola has produced sufficient evidence to establish the elements of a prima facie case of unlawful retaliation Title VII. Moreover, even if, viewing the record in the light most favorable to him, he was able to state a prima facie case, Spadola has failed to meet his evidentiary burden of persuasion to demonstrate that intentional discrimination was the true reason for the disciplinary actions taken against him.

### 1. *Protected Activity*

■ To establish participation in a protected activity within the ambit of Title VII, a plaintiff need not prove that the conditions he complained about actually constituted unlawful conduct amounting to a violation Title VII. *See Wimmer,* 176 F.3d at 134; *Quinn,* 159 F.3d at 769. Rather, the employee must demonstrate only that he had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. *See Wimmer,* 176 F.3d at 134 (citing *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988)). In this regard, the reasonableness of plaintiff's belief is assessed in light of the totality of the circumstances. *See Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998) (citing *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996)). The employee's belief that he was opposing an employment practice made unlawful by Title VII must also be objectively rea-

sonable, in the sense that the asserted opposition must be grounded on sufficient evidence that the employee was the subject of discrimination and harassment at the time the protest to the offending conduct is registered. *See Wimmer,* 176 F.3d at 135–36; *Holmes v. Long Island R.R.,* No. 96 Civ. 6196, 2001 WL 797951, at *4–5 (E.D.N.Y. June 4, 2001); *Dean v. Westchester Cty. Dist. Attorney's Office,* 119 F.Supp.2d 424, 432 (S.D.N.Y.2000); *Bampoe v. Coach Stores, Inc.,* 93 F.Supp.2d 360, 372 (S.D.N.Y.2000).

■ Moreover, as proper context, it bears consideration that to be actionable under Title VII, sexual harassment requires conduct so "severe or pervasive" as to alter the conditions of employment and create an objectively abusive working environment. *See Harris v. Forklift Systems,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *see also Faragher v. Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("'Simple teasing', offhand comments, and isolated incidents (unless extremely serious)" fail to satisfy that standard) (quoting *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

These standards were applied by the Supreme Court in *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 271–272, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001), in upholding a district court's granting of summary judgment that the Ninth Circuit had reversed. The facts in *Breeden* are instructive and provide controlling guidance in resolving the instant case. There, plaintiff, a female, met with her male supervisor and another male employee to review certain job applications. In the course of reading a report in one of the files, the supervisor read outloud a sexual comment the job-seeker had once made to a co-worker. The supervisor then remarked

that he did not know what the comment meant. The other employee replied "Well, I'll tell you later," and the two men chuckled. *Id.* at 269, 121 S.Ct. 1508. Plaintiff subsequently complained about the comment to the employee and his supervisor and to another manager of the employer. *Id.* She claimed that she was later punished in retaliation for these complaints. *Id.* at 270, 121 S.Ct. 1508.

The Supreme Court accepted without deciding the appropriateness of Ninth Circuit's rule that plaintiff's opposition to the offending comment was protected "if she had a reasonable, good faith belief that the incident involving the sexually explicit remark constituted unlawful sexual harassment." 532 U.S. at 270, 121 S.Ct. 1508. Reviewing the conditions that the employee must demonstrate prevail in the work place to establish actionable sexual harassment under its rulings in *Faragher, Harris* and related cases, the Supreme Court held that even under the assumed test "[n]o reasonable person could have believed that the single incident recounted above violated Title VII's standard." *Id.* at 271, 121 S.Ct. 1508.

The Court does not find sufficient evidence on the record before it from which a rational jury could reasonably determine that Spadola was engaging in a protected activity at the time he made his alleged threat to Washington. Here, the evidence fails to establish either that Spadola's belief was subjectively genuine or objectively reasonable. First, Spadola asserts that when summoned back to the office by Washington's calling to him "[h]oney, sweetie, dear, come back," Spadola pointed a finger at her and admonished that "[i]f you call me that again I will write you up for sexual harassment." Spadola testified that he had no intention of charging Washington with sexual harassment unless she repeated the remarks. (Spadola Dep. at 88.) In fact, he did not follow up on his

threat until he learned subsequently that Washington and Bedford had reported what had transpired and Bolds had brought charges against him stemming from the incident. He testified that he filed the charges only because the Authority had brought charges against him, and not necessarily because he felt humiliated, intimidated or offended in a manner that altered the conditions of his employment.

In other words, Spadola's own testimony belies that at the time the incident occurred he actually believed he had been a victim of sexual harassment, and demonstrates instead that he viewed the sexual harassment allegation as his own form of intimidation and retaliatory tactic designed to deter Washington from instituting disciplinary charges to punish his behavior. *Breeden* implicitly instructs that Title VII cannot properly be put to this use, and that an apparent effort to do so must be rejected. 532 U.S. at 271–272, 121 S.Ct. 1508. The statute is designed to protect the right of employees in good faith to protest discrimination they reasonably perceive they suffered, and to encourage reporting of serious offenses free from fear of reprisals, by proscribing retaliatory misconduct by the employer. *See Manoharan*, 842 F.2d at 593; *Kotcher v. Rosa & Sullivan Appliance Center, Inc.*, 957 F.2d 59, 63 (2d Cir.1992). In this framework, Congress could not have contemplated a contrary scheme as a legitimate purpose of Title VII retaliation claims: to arm employees with a tactical coercive weapon that may be turned against the employer as a means for the asserted victims to advance their own retaliatory motives and strategies, and thereby extract employment concessions on account of minor social lapses or harmless infractions in the workplace, or even to escape appropriate disciplinary measures.

When Spadola did voice his objection, he did so to the union representative, not to the Authority in accordance with applicable procedures. And he apparently did not pursue the matter when the union declined to press his complaint with management. Rather, he did not raise the issue again until the filing of his charge with the EEOC in November 1997. (*Id.* at 97.) These circumstances contradict Spadola's assertions that he had a genuine, good faith belief that, at the time the July 1997 Incident occurred, Washington's conduct constituted unlawful sexual harassment by his employer and that he reasonably felt he was opposing a violation of Title VII when he objected to the remark in question.

Second, under the totality of the circumstances, Washington's words, uttered during a heated encounter with Spadola, represented an offhand comment arising out of an isolated incident. Spadola presents no evidence that Washington's conduct was repeated, or that it otherwise manifested a work environment objectively hostile or abusive and so pervasive or severe as to alter the conditions of his employment. *See Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. In fact, the remark was spoken by a co-worker who was not Spadola's supervisor and, indeed, whom he had not met prior to the incident. The comment occurred during a tense verbal altercation in front of Spadola's supervisor. It conveyed nothing that evinced any endearing gender overtones or overtures under circumstances suggestive of unwanted, threatening or humiliating sexual advances that would unreasonably interfere with the employee's work or cause psychological harm, which form the hallmarks of serious misconduct ordinarily associated with unlawful sexual harassment. *See Harris,* 510 U.S. at 21–22, 114 S.Ct. 367; *Quinn,* 159 F.3d at 767–68; *Carrero v. NYC Housing Auth.,* 890 F.2d 569, 577–78 (2d Cir.1989); *see also Richardson v. NYS Dep't Corr. Serv.,* 180 F.3d 426, 436–437 (2d Cir.1999).

Spadola contends that he regarded Washington's words as inappropriate and impermissible under the Authority's discrimination policy. While it is true that Spadola is not required to demonstrate that the conduct in question would actually qualify as unlawful harassment, *see Quinn,* 159 F.3d at 769, his subjective belief by itself, even if held in good faith, would be insufficient if it were not reasonable. *See Breeden,* 532 U.S. at 270–71, 121 S.Ct. 1508.

The Court concludes that no rational jury could find that, under the totality of the circumstances evidenced here, Washington's isolated allegedly harassing remark made during the July 1997 Incident constituted a sufficient ground to support a good faith, objectively reasonable belief that the offending conduct constituted a violation of Title VII, and that Spadola had thus engaged in a protected activity when he protested the comment as an unlawful employment practice. *See id.* Insofar as the other unlawful practices Spadola alleges are predicated on retaliation arising from his asserted protected activity stemming from that episode, the claims would founder on the same grounds.

Accordingly, Spadola fails to satisfy the first element of a sufficient Title VII retaliation claim.

### 2. *Causal Relationship*

■ The Court finds that Spadola's evidence is also insufficient to establish the causation element of a retaliation claim: the relationship between the alleged protected activity and the adverse employment action. First, Spadola's dismissal occurred in July 1999, over two years after the July 1997 incident that gave rise to Spadola's alleged protected activity and nearly 20 months from the date Spadola

filed his charge with the EEOC complaining of sexual harassment. Courts have uniformly held that the longer the interval between the protected activity and the adverse employment action, the more attenuated becomes the evidence of the requisite causation. *See Breeden,* 532 U.S. at 273, 121 S.Ct. 1508 ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.' ") In *Breeden,* the Supreme Court, citing cases which had found three and four months insufficient, concluded that action taken 20 months after the alleged protected activity "suggests, by itself, no causality at all." *Id.* at 274, 121 S.Ct. 1508.

Spadola asserts that there is direct evidence of a causal connection between his threat to file a sexual harassment charge in connection with the July 1997 Incident and his suspension soon thereafter; that the Authority intensified its campaign of retaliatory harassment and intimidation, following unusual procedures, after he filed his EEOC charge in November 1997; and that some of the same individuals involved in the 1997 and 1998 disciplinary proceedings also played substantial roles in his final dismissal in 1999. He claims that each of these events constitute separate acts of retaliation and adverse employment actions cognizable under Title VII. The Court disagrees.

First, Spadola's contention is premised on a finding that in fact he had engaged in a protected activity when he protested Washington's remark. The Court has already concluded above that the evidence on the record is insufficient to support a reasonable finding to that effect. Second, beyond conclusory statements, speculation and remotely related circumstantial leaps and inferential bounds, Spadola presents

no compelling evidence of any action by the Authority substantiating his theory that every employment adversity that befell him after July 27, 1997 causally arose from his purported objection to Washington's isolated, offhand comment to him during their confrontation that day. In fact, the record sufficiently points to the contrary.

On three separate occasions in March, August and September, fellow employees complained to Spadola's supervisors of abusive, inappropriate conduct on his part. The Authority took no action following investigations of the incidents. These circumstances could not reasonably support a determination that his fellow employees' complaints, concerning which Spadola offers no reason as to why they should have been ignored under applicable regulations and procedures, constituted part of a "campaign of harassment" by the Authority, or that the Authority's inconclusive investigations could be characterized as adverse employment actions. Nor is there a trace of evidence on this record to sustain a reasonable inference that the complaints by Spadola's fellow employees about his conduct and the Authority's corresponding investigations in 1998 bore any causal connection with the charges of sexual harassment Spadola threatened or filed in 1997.

Though Spadola points to the proximity between the filing of his EEOC charge on November 14, 1997 and his second dismissal on November 24, 1997 as sufficient causation, this evidence is not dispositive. The investigation that led to the Authority's disciplinary proceeding arising out of the false overtime charges commenced sometime in July and the administrative proceedings were well underway at the time Spadola filed his EEOC charge. Under these circumstances, the Authority was not obligated to automatically cease or abandon an ongoing internal disciplinary procedure merely because an employee

files a charge alleging discrimination. *See, e.g., Breeden,* 532 U.S. at 272, 121 S.Ct. 1508 ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.")

With regard to his final dismissal in July 1999, Spadola similarly has the burden to produce sufficient evidence to support a rational finding that there was a causal connection between his discharge and his allegedly protected activity, that the grounds proffered by the Authority for its action were false and pretextual and did not constitute legitimate, neutral reasons, and that more likely that not discriminatory retaliation was the real ground for the termination of his employment. *See Hicks,* 509 U.S. at 506–07, 113 S.Ct. 2742; *Van Zant,* 80 F.3d at 714.

The Court finds that Spadola has not satisfied this burden. The record is more than ample to establish that the disciplinary charges the Authority instituted in June 1999 that resulted in Spadola's dismissal and that were the subject of the arbitration before Wittenberg related solely to the incident involving Felix. Spadola's termination in accordance with the charges brought against him were upheld by a neutral arbitrator pursuant to a collective bargaining agreement. This determination, absent compelling showing of bias or other impropriety, or that the ruling was not based on substantial evidence and thus was wrong as a matter of fact, is entitled to be accorded in this action highly probative weight of absence of discriminatory intent. *See Collins v. New York City Transit Auth.,* 305 F.3d 113, 119 (2d Cir. 2002). ("[A] decision by an independent tribunal that is not itself subject to a claim of bias will attenuate a plaintiff's proof of the requisite causal link.")

Spadola presents no evidence that casts any doubt on the impartiality of the arbitrator or that otherwise suggests that the fairness of the arbitration proceeding was compromised. Nor does he point to relevant facts not properly weighed by the arbitrator that would demonstrate that the arbitration award was not supported by substantial evidence. Spadola was represented by counsel during the proceeding and fully aired his version of the June 1999 confrontation. Wittenberg acknowledged and considered this evidence. (Lendino Decl. Ex. H, at 4.) Though Spadola argues that Wittenberg did not address the July 1997 Incident as a consideration, there is no indication in the record that the issue was specifically raised, nor that it was necessarily relevant to the determination of the grievance Wittenberg was called to arbitrate.

The Court thus concludes that Spadola has not satisfied his burden to establish the requisite causation to support a retaliation claim.

### 3. *Pretext for Discriminatory Intent*

■ Under the *McDonnell–Douglas* burden-shifting formulation that governs Title VII cases, where there are no allegations or direct evidence of acts of discrimination, Spadola is obliged to produce not simply "some" evidence but "sufficient" evidence to support a finding that the numerous charges of misconduct the Authority brought against him in various disciplinary proceedings between 1997 and 1999 and proffered by the Authority as legitimate, non-discriminatory reasons for its suspensions and dismissals of Spadola, were in fact false, and a mere pretext for unlawful discrimination more likely than not motivated by retaliatory animus engendered by Spadola's objection to Washington's 1997 remark. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996) (quoting *Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir.

1994)); *see also Hicks,* 509 U.S. at 515–517, 113 S.Ct. 2742. Throughout this framework, the ultimate burden of persuasion of demonstrating intentional discrimination remains with the Spadola. *See Hicks,* 509 U.S. at 507, 113 S.Ct. 2742.

Spadola points to the portion of the disciplinary charges lodged against him following the July 1997 Incident that specifically mentions his alleged "threat[ ] to bring false charges of sexual harassment against a member of management . . . ." and Nicolau's rejection of this ground as sufficient basis for a disciplinary action. But Spadola presents no persuasive evidence ultimately demonstrating that intentional discrimination grounded on his purported objections to the alleged sexual harassment, rather than his other recorded disciplinary problems, constituted the real reason for the measures the Authority instituted against him. Counterbalancing Nicolau's reference to the sexual harassment aspect of the Authority's disciplinary charges and overcoming any doubts and ambiguities resolved in Spadola's favor on this motion, as well as diminishing any surface persuasion that may attach to Spadola's claim, is Nicolau's finding that Spadola's conduct, particularly in the light of the evidence of "other episodes," was sufficiently serious to warrant a suspension.

Because, particularly in the context of a related arbitration award whose factual conclusions the Court exercises discretion to credit as highly probative, the sufficiency of Spadola's showing of causation to establish an inference of discriminatory retaliation as an element of his prima case, and that of the legitimacy of the Authority's proffered reason for its adverse employment action, "tend to collapse as a practical matter under the *McDonnell Douglas* framework," *id.* at 119 n. 1, the Court deems it unnecessary to consider in any greater depth Spadola's challenge to his 1999 dismissal as pretextual. Suffice it to say that the Court has examined Spadola's assertions of pretext and does not consider them sufficient to satisfy Spadola's burden of persuasion with respect to this test, and that the Court regards the arbitrator's award as more compellingly probative of the legitimate, non-discriminatory reasons proffered by the Authority for its dismissal of Spadola in July 1999.

## III. *ORDER*

For the reasons described above, it is hereby

**ORDERED** that the Court's Order dated December 27, 2002 is amended to incorporate the discussion set forth above; and it is finally

**ORDERED** that the Authority's motion for summary judgment herein is GRANTED.

The Clerk of Court is directed to close this case.

**SO ORDERED.**