Robert BURTON, Plaintiff,

v.

Robert BATISTA, Chairman, National Labor Relations Board, and Arthur F. Rosenfield, General Counsel, National Labor Relations Board, Defendants.

No. CIV.A. 03–1784(JDB).

United States District Court, District of Columbia.

Oct. 12, 2004.

David A. Branch, Law Office of David A. Branch, Washington, DC, for Plaintiff.

Peter Blumberg, Assistant United States Attorney, United States Attorney's Office for the District of Columbia, Civil Division, Washington, DC, for Defendants.

## MEMORANDUM OPINION

BATES, District Judge.

In this action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., plaintiff Robert Burton claims that he was the victim of unlawful sexual harassment and retaliation by defendant National Labor Relations Board ("NLRB"), and specifically by his supervisor Lisa Bevels. Based on factual materials in the record, but prior to full discovery, the NLRB has moved to dismiss or for summary judgment. Treating the motion as one for summary judgment pursuant to Fed.R.Civ.P. 56 as provided in Fed.R.Civ.P. 12(b), the Court will grant the motion.

## BACKGROUND

Plaintiff Burton, an African American male, is employed at NLRB as a GS–12 budget analyst responsible for planning, developing, coordinating and justifying formal NLRB budget submissions. Compl. ¶ 6. He first met Lisa Bevels, a white female, in December 2000 when she began employment at NLRB as the Deputy Budget Chief; Burton assisted her in learning that job. Id. ¶ 7. Bevels indicated in January 2001 that she intended to write performance plans to upgrade all GS–12 positions in the Budget Branch to GS–13. Id. ¶ 8. Beginning in January 2001, Bevels and Burton began to have coffee together each morning, and Burton alleges that during these meetings Bevels began to discuss intimate details of her personal life, including difficulties with her father and her ex-husband. Id. ¶ 9. Burton alleges that in April 2001, "Bevels pointedly asked Burton, 'Do you like and would you ever marry a white woman?' Burton firmly responded, 'No'." Id.

Another budget analyst, Bill Snuggs, who had previously worked with Bevels, was hired in April 2001 as a GS–12. Id. ¶ 10. Plaintiff alleges that although Snuggs had no prior budget experience as a GS–12 or at NLRB, his position was upgraded to a GS–13 within 90 days. Id. Burton claims that when he learned of Snuggs' advancement, he met with Bevels and Harding Darden, the Budget Branch Chief, to inquire, whereupon Bevels stated that she planned to upgrade all positions soon and asked Burton to remain at NLRB. Id. ¶ 11. Darden died in November 2001, and Bevels became acting Branch Chief and then in March 2002 became Branch Chief. Id. ¶ 14. According to Burton, "[i]n January 2002, Bevels terminated all personal conversations of a sexual nature with me." Pl.'s Opp'n, Ex. A (Burton Decl.) at ¶ 16.

Burton asked Bevels for a performance rating in January 2002 after observing no movement towards an upgrade of his position. Id. ¶ 17; Compl. ¶ 15. Burton contends that in January 2002 he also contacted the EEO office of NLRB to inquire about filing a formal complaint. Burton Decl. ¶ 18; Compl. ¶ 15. In February 2002, Bevels and Burton met, and Bevels "threatened to issue me a poor evaluation after I inquired at the EEO office about the lack of a performance appraisal." Burton Decl. ¶ 19; see Compl. ¶ 16. Burton also alleges that in February 2002 he sought EEO counseling "on sexual dis-

crimination, lack of a performance rating and other matters." Burton Decl. ¶ 20; *see* Compl. ¶ 16.

The meeting between Bevels and Burton regarding his performance rating occurred on February 20, 2002. There is evidence that, at that meeting, Bevels told Burton that based on his performance at the time, she would have to give him a low rating. *See* Defs.' Motion to Dismiss, Ex. 1 (Bevels Aff.) at 13–14, Ex. 3 (Burton to Bevels Memo. dated Feb. 20, 2002), and Ex. 4 (Bevels to Burton Memo. dated Feb. 25, 2002). In his memorandum of February 20, Burton claimed that he was qualified for a Grade 13 position and informed Bevels that he had not received a written performance appraisal since 1999; he copied his memorandum to the EEO office. Burton Feb. 20 Memo. at 1–2. In her responsive memorandum of February 25, Bevels detailed some of the problems she observed with plaintiff's work. It was apparently on February 25, 2002, that Burton made his initial contact with the NLRB's EEO office. *See* Defs.' Motion to Dismiss, Ex. 5 (EEO Counselor's Report) at 1.

Burton alleges in his Complaint that, since he engaged in EEO activity, Bevels and the NLRB have taken several discriminatory and retaliatory actions against him, including: failing to provide performance appraisals until May 2002; providing him a minimally successful rating for the periods ending May 2002 and May 2003; denying him a within grade increase; yelling at him in the office; denying him an upgrade to GS–13, while giving other budget analysts upgrades; sending harassing e-mails criticizing his use of annual leave and requiring advance clearance of annual leave requests; sending an e-mail requiring that he keep his office door open; and sending an e-mail criticizing him for minor mistakes. Compl. ¶ 17; *see* Burton Decl. ¶ 21.

Subsequently, however, Burton admits that his May 2003 performance appraisal rated him "fully successful," although he continues to complain about Bevels' failure to give him a within grade increase based on the 2003 rating. Burton Decl. ¶ 22. With respect to an upgrade of his position, Burton now contends that another budget analyst, Angie Jones, had her position upgraded to GS–13 during 2003. *Id.* ¶ 23.

After exhausting his administrative remedies, Burton filed a two-count complaint in August 2003. Count I alleges sexual harassment by Bevels, and Count II claims that Burton was subject to retaliation through a series of actions following his EEO activity.

## *LEGAL FRAMEWORK*

### I. Standard for Summary Judgment

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting Fed.R.Civ.P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements

as true and accept all evidence and make all inferences in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252, 110 S.Ct. 2822.

## II. The *McDonnell Douglas* Framework

■ A plaintiff has the burden of establishing a prima facie case of discrimination or retaliation by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a prima facie case of discrimination, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Stella v. Mineta*, 284 F.3d 135, 145 (D.C.Cir.2002); *Brown v. Brody*, 199 F.3d 446, 452 (D.C.Cir.1999). To make out a prima facie claim of retaliation, a plaintiff must establish that (1) he engaged in a statutorily protected activity; (2) the employer took an adverse personnel action; and (3) a causal connection existed between the two. *Brody*, 199 F.3d at 452; *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C.Cir.1985);

*McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984).

■ If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. The employer's burden, however, is merely one of production. *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089. The employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.*

■ If the employer is successful, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination or retaliation. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089). But "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination." *Id.* at 147, 120 S.Ct. 2097. Thus, the trier of fact may also "consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" *Id.* (quoting *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. 1089). "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors . . . includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is

false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 148–49, 120 S.Ct. 2097. As the D.C. Circuit has explained:

> Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (and at summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C.Cir.1998) (en banc); *see also Waterhouse v. District of Columbia*, 298 F.3d 989, 992–993 (D.C.Cir.2002).

 Although the "intermediate evidentiary burdens shift back and forth" under the *McDonnell Douglas* framework, " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). Once the defendant has proffered a legitimate non-discriminatory reason for its action, then, the question is whether that proffered reason is a pretext for discrimination, and at this point the *McDonnell Douglas* shifting burdens framework disappears, the sole remaining issue is discrimination *vel non*, and "to survive summary judgment the plaintiff

must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C.Cir.2003); *see Reeves*, 530 U.S. at 142–43, 120 S.Ct. 2097. Examination of that issue in this setting therefore requires consideration of all the relevant circumstances, including the strength of the prima facie case, any direct evidence of discrimination, and any circumstantial evidence that defendant's proffered explanation is false (which may be enough with the prima facie case to infer unlawful discrimination). *See, e.g., Reeves*, 530 U.S. at 147–48, 120 S.Ct. 2097; *Lathram*, 336 F.3d at 1089; *Waterhouse*, 298 F.3d at 993, *Aka*, 156 F.3d at 1290.

## ANALYSIS

In addition to his retaliation claims, Burton asserts in Count I of his Complaint that he has been the victim of "disparate treatment based on sex, when, among other things, he was subjected to sexual harassment by Lisa Bevels." Compl. ¶ 22. The NLRB initially took this vague formulation as a hostile work environment claim. While not totally disavowing that characterization, Burton has since asserted that his claim is more in the nature of *quid pro quo* sexual harassment. The Court will address each formulation in turn, before then addressing Burton's multi-pronged retaliation claim.

## I. Sexual Harassment

### A. Hostile Work Environment

 To establish a prima facie hostile work environment claim, Burton must demonstrate that: (1) he is a member of a protected class; (2) he was subject to unwelcome harassment; (3) the harassment occurred because of his gender; (4) the harassment affected a term, condition or privilege of employment; and (5) the em-

ployer knew or should have known of the harassment, but failed to take any action to prevent it. *See Jones v. Billington,* 12 F.Supp.2d 1, 11 (D.D.C.1997), *aff'd,* 1998 WL 389101 (D.C.Cir. June 30, 1998). However, the workplace environment becomes "hostile" for purposes of Title VII and legal relief only when the offensive conduct "permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quotation omitted); *accord Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *see also Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 270–71, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *Holbrook v. Reno,* 196 F.3d 255, 262 (D.C.Cir.1999).

 The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct rises to an actionable hostile work environment. Under *Faragher v. Boca Raton,* 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), in order to determine whether a work environment is sufficiently hostile to be actionable under Title VII, a court should consider: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct reasonably interferes with the employee's performance.

These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Properly applied, this will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."

*Id.* at 787, 118 S.Ct. 2275 (citations omitted); *see also id.* at 788, 118 S.Ct. 2275 ("simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient); *Stewart v. Evans,* 275 F.3d 1126, 1134 (D.C.Cir.2002) ("Even a few isolated incidents of offensive conduct do not amount to actionable harassment.").

 Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status. As the Second Circuit has explained:

Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

*Alfano v. Costello,* 294 F.3d 365, 377 (2d Cir.2002). Thus, "to sustain a hostile work environment claim ... [plaintiff] must produce evidence that [he] was discriminated against because of" his status. *Richardson v. New York State Dep't of Corr. Service,* 180 F.3d 426, 440 (2d Cir.1999) (claim for hostile work environment failed where only three of fifteen alleged incidents had racial overtones); *see also Farmer v. Cleveland Pub. Power,* 295 F.3d 593, 605 (6th Cir.2002) ("[A] racial or sexual hostile work environment claim is cognizable only if the purported harassment, viewed in conjunction with all of the circumstances, occurred because of the employee's race or gender."); *Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 345–46 (7th Cir.1999) (hostile work environment claim failed where there was insufficient evidence that

alleged harassing behavior was motivated by discrimination); *Jones v. Billington*, 12 F.Supp.2d at 12 (hostile work environment claim failed where plaintiff had "not demonstrated that any of the conduct of which he complains was related to his race, or that his workplace was permeated with racially discriminatory behavior").

■ Burton's allegations here fall far short of establishing a hostile work environment under this exacting standard. The sum total of his allegations as to sexual harassment is (1) that Bevels, his superior, discussed her personal life, including her relationship with her parents and her ex-husband, with him over morning coffee, (2) that she allegedly asked him, on a single occasion, "[d]o you like and would you ever marry a white woman?" (to which he responded "no" and she did not pursue the subject further), and (3) that she mentioned to him her sexual interest in another employee. This is simply not the type of "severe and pervasive" conduct necessary to constitute an alteration of the terms and conditions of employment, and thereby create a hostile work environment. *See Breeden*, 532 U.S. at 270, 121 S.Ct. 1508; *Faragher*, 524 U.S. at 786, 118 S.Ct. 2275; *Oncale*, 523 U.S. at 81, 118 S.Ct. 998.

There is nothing objectively or subjectively offensive about any of these topics— *i.e.*, a reasonable person would not find what was allegedly said by Bevels to be hostile or abusive, nor is there evidence that Burton in fact perceived Bevels' comments or questions to be offensive or insulting at the time. *See Harris*, 510 U.S. at 21–22, 114 S.Ct. 367. The question about marrying a white woman, while out of the ordinary, is not on its face a sexual inquiry, and is more in the nature of an "offhand comment" than a discriminatory alteration of the terms and conditions of employment. *See Faragher*, 524 U.S. at

787–88, 118 S.Ct. 2275. And the comment concerning an interest in another employee was not directed at Burton and there is no evidence that other person ever received any preferential employment treatment from Bevels. Notably, in none of these instances was an inappropriate or offensive comment directed at Burton.

In short, looking at the frequency, nature, severity, and offensiveness of the alleged conduct, and whether it reasonably interfered with Burton's job performance, *see Faragher*, 524 U.S. at 787–88, 118 S.Ct. 2275, the alleged conduct simply does not meet the threshold level of severe and pervasive discriminatory conduct. The Supreme Court has stressed that Title VII should not become a "general civility code," *id.* at 788, 118 S.Ct. 2275 (quoting *Oncale*, 523 U.S. at 80, 118 S.Ct. 998), and the totality of the alleged circumstances here does not state a claim for sexual harassment as a matter of law. Other courts have routinely rejected claims of sexual harassment based on conduct similar to or worse than that alleged by Burton. *See, e.g., Alagna v. Smithville R–II School Dist.*, 324 F.3d 975, 980 (8th Cir. 2003) (discussion of failed relationships and intimate details of personal life found indicative of need for friendship, not of harassment); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823–24 (6th Cir.1997) (jury verdict for plaintiff reversed where manager made numerous references about or to plaintiff concerning "sticky buns" and women's breasts); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430–31 (7th Cir. 1995) (jury verdict for plaintiff reversed where supervisor made numerous comments to plaintiff about being a "pretty girl," making his office hot, running around naked, and about his loneliness when his wife was out of town); *Russ v. Van Scoyoc Assoc., Inc.*, 122 F.Supp.2d 29, 31–33 (D.D.C.2000) (no violation where company officer made sexually explicit re-

marks to plaintiff and told her he admired her breasts and wanted to have sex with her).

Burton offers no meaningful response with respect to the absence of evidence regarding a hostile work environment. Accordingly, because the conduct Burton alleges is not (collectively) sufficiently severe and pervasive to go beyond "the ordinary tribulations of the workplace" and create an abusive working environment, Burton's hostile work environment claim must be dismissed. *See Faragher*, 524 U.S. at 787, 118 S.Ct. 2275.

**B. *Quid Pro Quo* Sex Discrimination**

▮▮▮ Nor does Burton fare any better when he instead pitches his claim as one for *quid pro quo* sex discrimination. The Supreme Court has recognized that actionable discrimination with respect to the terms and conditions of employment can be based on a supervisor's demand for sexual favors. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 752–54, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). But "[t]he gravamen of a *quid pro quo* claim is that a tangible job benefit or privilege is conditioned on an employee's submission to sexual blackmail and that adverse consequences follow from the employee's refusal." *Gary v. Long*, 59 F.3d 1391, 1395 (D.C.Cir.1995) (quotation omitted).

Nothing approaching "sexual blackmail" is alleged here. The comments and questions allegedly made by Bevels did not seek any sexual favors or make any sexual advances. Such a sexual demand is the necessary "quid" in the *quid pro quo* sexual harassment claim, and it is plainly absent here. Discussing personal details of one's life, asking a black man whether he would ever marry a white woman, and

mentioning a sexual interest in another employee all fall far short of the requisite sexual demand for *quid pro quo* harassment. Hence, Count I of Burton's Complaint must be dismissed whether framed in terms of a hostile work environment or *quid pro quo* sexual harassment.

**II. Retaliation**

Burton's retaliation claim breaks down into four categories: e-mail or other communications regarding Burton's job performance; his 2002 minimally successful performance evaluation; his 2003 fully successful performance evaluation; and the failure to upgrade his position to GS–13. Each calls for a somewhat different analysis, although ultimately none can survive summary judgment.

**A. E-mail and Other Communications**

▮▮▮ Just as for a claim of discrimination, a prima facie claim of retaliation requires that plaintiff establish that the employee suffered an adverse personnel action. *See Brody*, 199 F.3d at 452. Certain of plaintiff's retaliation claims relate to communications he allegedly received from Bevels: yelling at him in the office, e-mails criticizing his use of annual leave and setting requirements for advance clearance of annual leave, an e-mail requiring that he keep his office door open, and an e-mail criticizing him for minor mistakes. Under the law in this Circuit, those events do not constitute actionable adverse personnel actions.

▮▮▮ This Circuit's decision in *Brown v. Brody* examined whether certain alleged employment activities constituted adverse employment actions for a prima facie claim of disparate treatment or retaliation under Title VII. Building on earlier observations in private employment settings, the court concluded that "federal employees like

their private counterparts must show that they have suffered an adverse personnel action in order to establish a prima facie case under the *McDonnell Douglas* framework." 199 F.3d at 455. Under *McDonnell Douglas*, a common element of a prima facie case for both disparate treatment discrimination and retaliation is thus the requirement that plaintiff suffered "some form of legally cognizable adverse action by the employer." *Id.* at 453 (citing *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448 n. 10 (11th Cir.1998)). This is so because under the provisions of Title VII "there must still be some kind of injury for [an] employee to state a claim," and thus an "employee must first be 'aggrieved' in order to bring an action." *Brody*, 199 F.3d at 455.

In determining whether a challenged action constitutes an adverse employment action, a court should focus on "ultimate employment decisions" such as "hiring, granting leave, discharging, promoting, and compensating," not intermediate decisions "having no immediate effect upon employment decisions." *Taylor v. FDIC*, 132 F.3d 753, 764 (D.C.Cir.1997). Employer actions short of outright firing or non-selection for promotion can be adverse, but not all lesser actions count for purposes of Title VII liability. *See Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C.Cir.2002). Thus, "[t]o establish an adverse personnel action in the absence of diminution in pay or benefits, plaintiff must show an action with 'materially adverse consequences affecting the terms, conditions, or privileges of employment.' " *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C.Cir.2002) (quoting *Brody*, 199 F.3d at 457) (decision of district court reprinted with endorsement from D.C. Circuit panel). Indeed, "[a]n 'employment decision does not rise to the level of an actionable adverse action ... unless there is a tangi-

ble change in the duties or working conditions constituting a material employment disadvantage.' " *Id.* (quoting *Walker v. WMATA*, 102 F.Supp.2d 24, 29 (D.D.C. 2000)); *see also Burlington Indus.*, 524 U.S. at 761, 118 S.Ct. 2257 ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."); *Brody*, 199 F.3d at 457 (plaintiff must show "objectively tangible harm"); *Raymond v. U.S. Capitol Police Bd.*, 157 F.Supp.2d 50, 56 (D.D.C.2001) (requiring "tangible change in responsibilities or working conditions that constitutes a material employment disadvantage"). Changes in assignments or work-related duties do not ordinarily constitute adverse employment actions if "unaccompanied by a decrease in salary or work hour changes." *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556–57 (D.C.Cir. 1997). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996). Purely subjective injuries, such as dissatisfaction with reassignment, public humiliation or loss of reputation, or unhappiness over assigned duties are not adverse actions. *See Forkkio*, 306 F.3d at 1130–31. Rather, there must be a significant change in job responsibilities. *See id.* at 1131 (where employee's "substantive responsibilities [a]re not reduced," there are no materially adverse consequences for Title VII liability).

The D.C. Circuit has noted that formal criticism or poor performance evaluations are generally not adverse employment actions if they do not affect the employee's grade or salary. *See Brody*, 199 F.3d at 458; *see also Russell v. Principi*, 257 F.3d 815, 819 (D.C.Cir.2001) (negative performance evaluations are not adverse actions absent some effect on terms, conditions or

privileges of employment); *Lewis v. Glickman*, No. Civ. A 96–0358, 1997 WL 276084, at *6 (E.D.La. May 15, 1997) (late receipt of performance appraisal is "of no moment"). No less is true for informal criticism of the type Burton alleges that he received in e-mails from Bevels. Certainly employers are permitted to criticize an employee's work without giving rise to a federal cause of action. *See Weigert v. Georgetown Univ.*, 120 F.Supp.2d 1, 17 (D.D.C.2000) ("Formal criticism and poor performance evaluations do not ordinarily constitute 'adverse actions.' "); *Brodetski v. Duffey*, 141 F.Supp.2d 35, 47 (D.D.C. 2001) ("[C]riticism of an employee's performance unaccompanied by a change in position or status does not constitute adverse employment action."). The minor criticism of which Burton complains, from which no tangible employment consequences flowed, is simply not enough to support a retaliation claim.

■ So, too, the monitoring of annual leave alleged by plaintiff through other Bevels e-mails falls well short of actionable adverse employment action. Being closely supervised or "watched" does not constitute an adverse employment action that can support a claim under Title VII. *See, e.g., Chika v. Planning Research Corp.*, 179 F.Supp.2d 575, 587 (D.Md.2002) (allegations of close monitoring and repeated questioning about work fail to state a claim); *Boykins v. Lucent Tech.*, 78 F.Supp.2d 402, 414 (E.D.Pa.2000) (allegation of being "watched over" does not constitute an adverse action); *Flanagan–Uusitalo v. D.T. Indus., Inc.*, 190 F.Supp.2d 105, 117 (D.Mass.2001) (allegation of excessive scrutiny not enough to establish ad-

verse action); *McCoy v. Macon Water Auth.*, 966 F.Supp. 1209, 1221 (M.D.Ga. 1997) (being watched and having to report to particular supervisor are not adverse employment actions). Again, Burton has not established, or even alleged, any tangible adverse consequences affecting the terms and conditions of his employment. Monitoring of the use of annual leave is a common feature of federal employment, and does not amount to an adverse employment action.

■ Finally, absent any facially discriminatory remarks (and Burton alleges none), exposure to yelling from a supervisor is similarly not an actionable adverse employment action. The discrimination laws do not guarantee employees a stress-free work environment. *See Connors v. Chrysler Fin'l Corp.*, 160 F.3d 971, 976 (3d Cir.1998); *Wilder v. Southeastern Pub. Serv. Auth.*, 869 F.Supp. 409, 418 n. 5 (E.D.Va.1994); *aff'd*, 69 F.3d 534 (4th Cir. 1995).

## B. 2002 Minimally Successful Evaluation

■ Burton asserts that his 2001–2002 performance evaluation, in which he received a minimally successful rating, was in retaliation for protected EEO activity. Initially, it appeared he was complaining not only about the rating itself but also about a delay in receipt of the evaluation. However, it is now undisputed that the 2002 performance evaluation was given in May 2002, and hence was timely.[1] Burton's retaliation claim, therefore, is that he was "downgraded" to minimally successful in retaliation for prior EEO activity.

---

1. Although Burton has alleged that his 2000 and 2001 performance evaluations were improperly delayed in retaliation for EEO activity, any such delay occurred long before the protected EEO activity Burton alleges. More-over, as explained above, a delay in receipt of a performance evaluation is not itself an adverse employment action that can support a retaliation claim.

Nonetheless, timing remains a key issue, because the NLRB contends that the 2002 minimally successful rating given in May 2002 was not caused by any protected EEO activity—*i.e.*, that there is no causal link between protected activity and the adverse employment action. The NLRB's position is based on *Clark County Sch. Dist. v. Breeden,* in which the Supreme Court held that if an employer simply proceeds along lines already plainly contemplated, even if not yet finally determined or effectuated, that "is no evidence whatever of causality." 532 U.S. at 272–73, 121 S.Ct. 1508; *see also Bush v. Engleman,* 266 F.Supp.2d 97, 103 (D.D.C.2003); *Spadola v. New York City Transit Auth.,* 242 F.Supp.2d 284, 294 (S.D.N.Y.2003). Upon close examination of the facts in the record, the Court concludes that the NLRB is correct.

Burton alleges that he asked Bevels for a performance rating in January 2002. Compl. ¶ 15; Burton Decl. ¶ 17. It is undisputed that in February 2002, specifically on February 20, 2002, Bevels and Burton met, and that at that meeting Bevels told Burton that based on his performance at the time, she would give him a low rating. *See* Burton Feb. 20 Memo. at 1 (quoting Bevels as stating that "If I had to give you a rating today, I would have to rate you poorly because you have too many errors that I have to have correct."); Defs.' Mot. to Dismiss, Ex. 1 (Bevels Aff.) at 13–14. Burton alleges that in February 2002 he sought EEO counseling "on sexual discrimination, lack of a performance rating and other matters." Burton Decl. ¶ 20; Compl. ¶ 16. Moreover, he asserts that when he met with Bevels in February 2002, Bevels "threatened to issue me a poor evaluation after I inquired at the EEO office about the lack of a performance appraisal." Burton Decl. ¶ 19; *see* Compl. ¶ 16. The EEO Counselor's Report issued on May 24, 2002, specifically lists the date of initial EEO counseling contact as "[a]bout 2/25/02" and the date of initial EEO interview as "2/26/02." Defs.' Mot. to Dismiss, Ex. 5 at 1.

It is clear, then, that when Bevels met with Burton on February 20, 2002, she informed him that his rating would be a poor one. That fact is sufficient for this Court to conclude, consistent with *Breeden,* that the May 2002 minimally successful evaluation was a result already contemplated and under way as of February 20, 2002. The more difficult issue, however, is whether as of that date Burton had already engaged in protected EEO activity. The NLRB contends that only following the February 20 discussion, and indeed as a result of it, did Burton write his February 20 memorandum that was copied to the EEO office and then several days later contact the EEO office. Burton's February 20 memorandum, the EEO Counselor's Report, and Bevels' testimony all fully support that chronology of events.

Burton, however, has somewhat vaguely alleged in his Complaint that in January 2002 he "contacted the EEO office to inquire about filing a formal complaint," Compl. ¶ 15, and that "[i]n February 2002, [he] sought EEO counseling," Compl. ¶ 16. The reference to EEO contact in February 2002 is, the Court concludes, too vague to create a genuine factual issue. His initial contact was on about February 25, as reflected in the EEO Counselor's Report, which is both consistent with Burton's allegation and supportive of the NLRB's contention that a causal link is absent here.

The record does not support Burton's vague contention that he had some contact with the EEO office in January 2002. His conclusory assertion amounts to the proverbial "scintilla" of "merely colorable" evidence that is not sufficiently probative to avoid summary judgment. *See Anderson,*

477 U.S. at 249–50, 252, 106 S.Ct. 2505. Moreover, Burton does. not contend that this supposed contact is ·the basis for his retaliation claim. Nor·could it be. Bevels was not aware of any such informal inquiry with the EEO office at the time of the February 20 meeting and her statement to Burton that his evaluation would be poor. *See* Bevels' Aff. at 23–24. Burton does not contend that she was. Absent such an awareness, there can be no inference that she acted with a retaliatory motive when she informed him on February 20 that· his rating would be a low one. *See, e.g., Joshi v. Prof. Health Services,* 606 F.Supp. 302, 307 (D.D.C.1985) (plaintiff in retaliation action must show defendant knew of protected activity).

 In his Opposition, Burton retreats from ` basing his retaliation claim on an alleged EEO contact in either January or February 2002. Instead, he asserts that his negative response to inappropriate sexual conversations and inquiries from Bevels constitutes protected EEO activity. *See* Pl.'s Opp'n at 18. The Court disagrees. Simply answering no to a question from a superior that is unconnected to any EEO activity or discrimination claim, and that the Court has already concluded was neither a sexual demand nor sexual harassment, is not protected EEO activity for purposes of establishing a prima facie case of retaliation. *See* discussion *infra* Part II.D. If it were, there would be virtually no limit to the workplace events that might be categorized as protected EEO activity.

### C. 2003 Fully Successful Evaluation

██ It is now clear that Burton received a fully successful performance evaluation in 2003, not the minimally successful rating alleged in his Complaint. What is also apparent, however, is that Burton qualified for a within-grade increase

("WIGI") in June 2003 based on his overall rating of fully successful, but that the NLRB failed to process his WIGI until January 2004, when he was given the WIGI retroactive to June 1, 2003, with full back pay and interest. Burton now claims that the refusal to process his within-grade increase in a timely manner was retaliatory.

 Assuming that the failure to timely award Burton a WIGI could have been an adverse employment action giving rise to a retaliation claim, certainly it no longer is. He has now received all the salary and interest he is owed, and the recision and correction of an employment action means that it is no longer "adverse." *See Dobbs–Weinstein v. Vanderbilt Univ.,* 185 F.3d 542, 544 (6th Cir.1999) (employment action is not adverse when it is rescinded and full back pay is awarded); *Holmes v. Am. Drug Stores, Inc.,* No. 02–C–0490, 2003 WL 21147807, at *5 (N.D.Ill. May 14, 2003) (no adverse employment action where demotion was rescinded and full back pay provided). The NLRB, moreover, has explained the administrative oversight that caused the delay in processing. Burton's WIGI, and that Bevels had nothing to do with it. *See* Defs.' Reply, Ex. B (Wonkovich Decl.) ¶¶ 4–6. Burton has not disputed this legitimate, non-discriminatory explanation, which is sufficient to defeat any claim of retaliation.

### D. Upgrade to GS–13

Burton's final retaliation claim—that the NLRB failed to give him an upgrade to the ·GS–13 level—has also undergone a transformation during briefing on the NLRB's motion. Initially, the claim focused on a comparison of Burton with Bill Snuggs, who allegedly was brought to the NLRB by Bevels as a GS–12 budget analyst but then promptly upgraded to a GS–13. *See* Compl. ¶¶ 10–11. More recently,

however, Burton has pointed to another NLRB employee, Angie Jones, as a comparator, contending that the upgrade of her position to GS–13 in June 2003 supports his retaliatory non-promotion (or "non-upgrade") claim. *See* Pl.'s Opp'n at 20.

■■■ The NLRB correctly argues that because Snuggs was promoted to GS–13 in mid–2001, long before Burton engaged in any protected EEO activity, that promotion cannot serve as the basis for a retaliation claim. Burton acknowledges that Snuggs was hired in April 2001 as a GS–12 and upgraded to GS–13 within 90 days. *See* Burton Decl. ¶ 11. That was months before any protected EEO activity by Burton, and hence causation would seem patently absent.

■■■ Burton's response is to focus on his negative reply to Bevels' inquiry in April 2001 about marrying a white woman, which he contends was protected activity for purposes of establishing a retaliation claim. But there is simply no basis for that position.

■■■ Under Title VII, unlawful retaliation by an employer can be based either on a employee's opposition to an unlawful employment practice or on an employee's participation in a discrimination charge, investigation, or proceeding. 42 U.S.C. § 2000e–3(a); *see Borgo v. Goldin,* 204 F.3d 251, 255 n. 4 (D.C.Cir.2000). Here, it is the "opposition clause" that Burton invokes. However, his reply to Bevels' inquiry is not the type of oppositional activity covered by Title VII because Bevels was not engaged in an unlawful employment practice. As explained earlier, her alleged inquiry was neither a sexual demand nor sexual harassment. To come within the opposition clause of Section 2000e–3(a), one must demonstrate an objectively reasonable belief that the practice

"opposed" actually violated Title VII; otherwise, the activity (here, simply a negative response to an inquiry) was not statutorily protected activity. *See Breeden,* 532 U.S. at 271, 121 S.Ct. 1508 (since no reasonable person could have believed that a single incident implicated Title VII's sex discrimination coverage, retaliation claim was properly dismissed); *Parker v. Baltimore & Ohio R.R. Co.,* 652 F.2d 1012, 1019–20 (D.C.Cir.1981) (holding that an employee seeking the protection of the opposition clause must "demonstrate a good faith, reasonable belief that the challenged practice violates Title VII"); *Trent v. Valley Elec. Ass'n Inc.,* 41 F.3d 524, 526 (9th Cir.1994) (employee must have a "reasonable belief that the employment practice she protested was prohibited under Title VII" (quotation omitted)). Burton's claim fails the "objectively reasonable" test, which is designed to protect an employer "against malicious accusations and frivolous claims" of retaliation, *see Parker,* 652 F.2d at 1020, because no person could reasonably believe that the minor event described by plaintiff constitutes sexual harassment. Moreover, it is not at all clear that Burton "opposed" any conduct by Bevels, since Burton does not allege that he told Bevels to stop discussing personal matters with him, indicated he was offended, or brought the matter to the attention of anyone at the NLRB. Without some indication of protest, it is hard to label his curt "no" as opposition to an unlawful practice under Title VII. Indeed, such a conclusion would risk transforming innumerable discriminatory workplace events into retaliation claims as well.

■■■ Burton also cannot establish a prima facie claim of retaliation based on the failure to upgrade his position to a GS–13 when compared to the upgrade received by another NLRB budget analyst, Angie Jones, in June 2003. Although causation

is not lacking when Ms. Jones is the comparator, a retaliatory non-promotion claim still fails because of a crucial difference between Jones and Burton.

The NLRB has established, without any factual rebuttal by Burton, that Jones' position was audited by a personnel specialist in the Human Resources Operations Section of NLRB, who recommended an upgrade to GS–13 based on the job duties and government-wide classification standards. *See* Defs.' Reply, Exs. A (Joseph Decl.) ¶ 3, B (Wonkovich Decl.) ¶ 7. No other budget analyst positions besides Jones' were considered during the audit. Wonkovich Decl. ¶ 7. Thereafter, Burton inquired about a similar upgrade, and was informed of the procedure for requesting an audit of his position to determine whether his duties warranted a higher grade. Joseph Decl. ¶ 4. Burton has never requested an audit of his position, even though he is authorized to do so under NLRB regulations and has been specifically advised of the procedure to follow. *See* Joseph Decl. ¶¶ 4–5; Wonkovich Decl. ¶ 9.

In this circumstance, Burton is not similarly situated to Jones, because he has failed to take a necessary but available step towards obtaining the same audit review and promotion that she received—a step that is totally within his control. The failure to request a desk audit that could lead to a promotion condemns his retaliatory non-promotion claim to failure. *See Marshall v. Shalala*, 16 F.Supp.2d 16, 20 (D.D.C.1998) (The opportunity to gain a promotion through a desk audit "existed all along and [plaintiff] simply failed to seize it. Because plaintiff failed to take even the most elementary step necessary by applying for a promotion to the GS–13 level, this Court finds that plaintiff has failed to establish a prima facie case of discriminatory non-promotion."). Even if one assumes that Burton has established a prima facie case of retaliation based on a comparison to Jones, this difference in their situations is a legitimate, non-discriminatory reason for the NLRB's failure to promote Burton, which defeats his retaliation claim.

### CONCLUSION

When all is said and done, plaintiff has failed, for the reasons explained above, to establish the necessary elements for either his sexual harassment or his retaliation claims. Nor has he asserted a basis to defer ruling on defendants' motion in order to permit discovery.[2] Defendants' motion for summary judgment will therefore be granted. A separate order accompanies this Memorandum Opinion.

### ORDER

Upon consideration of defendants' motion for summary judgment, the parties' memoranda, and the entire record herein, and for the reasons explained in the Memorandum Opinion issued on this date, it is this 12th day of October, 2004, hereby

ORDERED that defendants' motion is GRANTED and judgment is accordingly entered in favor of defendants.

---

**2.** Burton has filed a "certification" pursuant to Fed.R.Civ.P. 56(f), which simply repeats the language of the Rule in conclusory fashion, but does not explain any reasons (as required by the Rule) why further discovery is necessary in order to oppose defendants' motion. The grounds upon which the Court has ruled in rejecting the sexual harassment and retaliation claims would not be impacted by discovery, given that the Court has taken into full account the allegations in plaintiff's Complaint and Declaration, and plaintiff does not identify in his certificate just how he anticipates additional discovery would provide support for his claims beyond what he has to date provided.