FILED
United States Court of Appeals
Tenth Circuit

December 22, 2023

Christopher M. Wolpert
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

BARBARA LINDSAY,

     Plaintiff - Appellant,

v.

DENVER PUBLIC SCHOOLS;
STEPHANIE DONNER,

     Defendants - Appellees.

No. 22-1408

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:20-CV-03477-CMA-MEH)**

_____

Reid R. Allison of Killmer, Lane & Newman, LLP, (Darold W. Killmer with him on the briefs) Denver, CO, for Plaintiff-Appellant.

Holly E. Ortiz of Semple, Farrington, Everall & Case, P.C., Denver, CO, for Defendant-Appellee.

_____

Before **HARTZ**, **MORITZ**, and **ROSSMAN**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Plaintiff Barbara Lindsay was the Director of Workforce Development and

Career Services at Emily Griffith Technical College (EGTC), in Denver, Colorado. After

Lindsay was notified of her termination in July 2019 by Defendant Stephanie Donner, the Executive Director (ED) for EGTC at the time, Lindsay sued Defendants Denver Public Schools (DPS) and Donner, asserting retaliation claims under several federal and state laws: (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (against DPS); (2) 42 U.S.C. §§ 1981 and 1983 (against DPS and Donner); and (3) the Colorado Anti-Discrimination Act (CADA), Colo. Rev. Stat. § 24-34-301, *et seq.* (against DPS and Donner). Lindsay alleged that she had been terminated in retaliation for protected conduct: namely (1) her expressed opposition to racist comments about an applicant for the ED position made by another person during the hiring process and (2) her assistance to that applicant in filing employment-discrimination charges. The United States District Court for the District of Colorado granted summary judgment for Defendants on all claims, holding that they failed for lack of sufficient evidence that her termination was caused by her alleged protected conduct. The court explained that no DPS or EGTC official connected with Lindsay's termination knew of that conduct.

Lindsay appeals the summary judgment. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the judgment below, agreeing with the district court that Lindsay failed to provide sufficient evidence of causation.

## I.     BACKGROUND

### A.     Factual Background

We summarize the relevant parts of the record, reviewing the evidence in the light most favorable to Lindsay.

According to Lindsay, she "was a highly qualified and successful" administrator who had received a substantial raise in early 2019 and received uniformly excellent evaluations from superiors and praise from her subordinates. Aplt. Br. at 2. But then there was a change in her boss.

### 1.    The Executive Director Interviews

In February 2019, EGTC's ED resigned and DPS began to review candidates for the position. David Suppes, DPS's then-Chief Operating Officer (COO), met with four candidates. Tisha Lee, a Black woman who was the Director of Student Services at EGTC, was one of those interviewed. All four candidates advanced to the next selection phase, which involved interviews by two different panels. The first panel ranked Beth Bean and Donner as the top two candidates. Lindsay served on the second panel with Zach Hermsen, interim ED of EGTC; Tatiana Hernandez, the EGTC foundation president; and four other panelists not relevant to this dispute. After the second-panel interviews, the panel members had a "debrief" discussion on April 8, 2019. During the discussion Hernandez raised a concern regarding Ms. Lee's grammar and said that "being a person of color, she should be held to a higher standard." Aplt. App., Vol. I at 151. Hernandez also questioned Lee's fundraising abilities. In response to Hernandez's comments, Lindsay defended Lee. Although Lindsay acknowledged that she "didn't use the word discrimination," Aplt. App., Vol. I at 152, she did criticize the reference to Lee's race and said that she had worked with Lee, that Lee was always professional, and that the comment regarding Lee's grammar should be disregarded. Lindsay also stated that she had attended

fundraising events with Lee and that Lee had fundraising connections and could bring funds to EGTC. The second panel recommended that Bean and Lee advance to the next interview, and Lee was invited to that interview by COO Suppes's administrative assistant; but Suppes decided to advance Bean and Donner, and not Lee, to the final interview. Donner was eventually selected as ED.

After learning that Lee had not been selected, Lindsay notified her of the negative comments at the second-panel debrief. Lee then filed charges of discrimination with the Equal Employment Opportunity Commission (EEOC) on April 26, 2019, and with the Colorado Civil Rights Division (CCRD) on July 18, 2019. Lee's charges said that a member of the second panel told her about the racist comments of another panelist, but they did not name Lindsay or otherwise identify which of the seven members of the panel was her source. And Lee testified in her deposition that she did not tell anybody working for DPS about Lindsay's role in the charges before Lindsay was fired.

### 2.    *Donner As Executive Director*

Donner began working at EGTC about June 17, 2019. As part of her transition to ED, she met several times with Hermsen, who had been serving as the interim ED and was present at the second-panel debrief when the negative comments were made. Lindsay was not present at the Donner-Hermsen meetings and was never told what was discussed. Hermsen stated in a sworn declaration that he did not tell Donner about the negative comments made during the debrief or even discuss the EGTC hiring process. He also swore that before Lindsay was terminated he did not know

that Lee had filed discrimination charges or know Lindsay's role in the charges, although Lee had told him that she wanted to file a discrimination complaint and asked him whom to contact at DPS.

Lindsay alleges that when Donner became ED, she "was openly hostile to [Lindsay] and treated her less favorably than her colleagues." Aplt. Br. at 4. In particular, she claims that Donner "hostilely argued with her in a way that she did not with any other department head." Aplt. Reply Br. at 8. But other employees said that Donner commonly was rude and disrespectful to subordinates.[1]

### 3.    Lindsay's Termination

On July 2, 2019, Hermsen, Donner, and Jo Caldwell, an employee in the EGTC human-resources department, received a complaint from former EGTC employee Jacob Vigil, who had been a subordinate of Lindsay's. The complaint alleged Lindsay subjected Vigil to a hostile work environment, discriminated against Hispanics, overpaid EGTC employee Byron O'Bayley, and interfered with the hiring process for a position on her team. DPS policy required an investigation of the complaint. Hermsen assigned the task to Caldwell. Caldwell interviewed Vigil, Lindsay, and at least five other employees. She also reviewed emails and financial reports concerning O'Bayley's pay that had been provided to her by Hermsen and a finance employee. Caldwell stated in a sworn declaration that during her

---

[1] Lindsay also asserts that Donner took "EGTC out of successful and financially successful grant programs that Ms. Lindsay oversaw." Aplt. Reply Br. at 8. But she points to nothing in the record below that supports her assertions about grant programs.

investigation she knew of Lee's discrimination charges, but she did not know about Lindsay's role in the charges or that she had spoken up at the second-panel debrief. As a result of the investigation, Caldwell made preliminary findings that Lindsay had allowed O'Bayley to be paid for work he did not perform, acted unprofessionally, and interfered with the integrity of the hiring process. Caldwell based her finding regarding O'Bayley on financial documentation that she believed indicated O'Bayley was paid for a career-services job during a time he was not working in the career-services department. Caldwell's findings regarding Lindsay's unprofessionalism were based on interviews corroborating Vigil's allegation that Lindsay had shown favoritism to Caucasian employees, including O'Bayley, although she did not substantiate his allegation that Lindsay had discriminated against Hispanic employees. And Caldwell's finding regarding interference with the hiring process was based on an email Lindsay sent to a hiring committee that was considering a sight-impaired applicant who apparently had previously worked with Lindsay. Lindsay's email asked the committee, which included several of her subordinates, to consider the benefits of hiring a disabled person. Caldwell believed that the message would make Lindsay's subordinates less likely to express their true opinions on the matter.

After consulting with DPS's legal and human-resources departments, Caldwell drafted a termination letter embodying her investigatory conclusions and gave it to Donner, who presented it to Lindsay on July 31, 2019, notifying her of her termination, effective immediately.

## II.     DISCUSSION

We review the summary judgment de novo, applying the same standard that the district court is to apply. *See Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017). Viewing the evidence in the light most favorable to Plaintiff, and drawing all reasonable inferences in her favor, we must determine whether a genuine issue of material fact exists. *See id.*

Although Lindsay raises her retaliation claim under four different statutes, all require that she prove that she engaged in protected activity, that the defendants took adverse action against her, and that there was a causal relationship between the protected activity and the adverse action. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1192 n.3, 1193 (10th Cir. 2012) (retaliation claims under Title VII and CADA); *Davis v. Unified Sch. Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014) (retaliation claims under Title VII and 42 U.S.C. § 1981); *Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1297 (10th Cir. 2013) (retaliation claim under 42 U.S.C. § 1983); *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399–401 (Colo. 1997) (discrimination claims under CADA are assessed under same legal standards as Title VII). It is the absence of proof of the third element—the causal connection between the protected activity and the adverse action—that dooms Lindsay's claim. (We need not address whether her allegedly protected activity was in fact protected.) Perhaps there are subtle analytical variations with respect to how causation is assessed for retaliation claims under each of the statutes invoked by Lindsay, *see generally Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)

Page **7**

(discussing causal link required for Title VII retaliation claims), but that is of no moment here because the evidence cannot support a claim that Lindsay's participation in a protected activity influenced in any way the decision to fire her. We agree with the district court that Lindsay failed to show a causal connection between her termination and her allegedly protected activity—namely, (1) expressing her opposition to discriminatory comments during the ED hiring process and (2) her assistance to Lee in filing claims with the EEOC and the CCRD.

To establish the requisite causal connection, Lindsay needed to show that the decisionmakers took action against her out of a desire to retaliate for her objection to Hernandez's comments at the debrief or for providing information for Lee to use in her discrimination charges. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). "As a prerequisite to this showing, [Lindsay] must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire [her] had knowledge of [her] protected activity." *Id.* at 1203. After all, "an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of [the antidiscrimination statute]." *Petersen v. Utah Dept. of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002). Lindsay was therefore required to marshal evidence that those who acted against her—Donner and those on whom Donner relied—knew of either Lindsay's statements at the second-panel debrief in defense of Lee or Lindsay's role in Lee's charges. This she has failed to do. All her arguments to support knowledge are based on bare speculation. *See Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 875 (10th

Page **8**

Cir. 2004) ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.").

First, Lindsay argues that because Hermsen—who was present at the second-panel debrief in which the negative comments were made by Hernandez and objected to by Lindsay—met frequently with Donner at the start of her tenure as ED, "Hermsen indisputably had every opportunity to tell Donner who it was that had objected to the racist conduct (and therefore had provided the information to Ms. Lee)." Aplt. App., Vol. II at 321. But both parties to those meetings denied under oath that Hermsen ever disclosed such information. Donner stated in her sworn declaration that she did not know about either the negative comments made at the debrief or the subsequent charges filed by Lee until August or September 2019 (well after Lindsay's termination) and did not know about Lindsay's role in Lee's charges until October 2019. And in his sworn declaration, Hermsen stated that in his meetings with Donner he did not discuss the EGTC hiring process, the negative comments made, or that Lindsay had provided such information to Lee. Indeed, Hermsen said that he did not even know until after Lindsay's termination that Lee had filed any discrimination charges. Nor has Lindsay presented any reason to think that Hermsen would bring up those matters in his conversations with Donner. Whatever Lindsay did during the vetting process had not injured Donner in any way—she got the job— so it would not be as if Donner would be trying to find out what went wrong. And Donner and Hermsen had more than enough to discuss during their meetings as Hermsen turned over the reins of the ED position to Donner. Lindsay's suggestion

Page **9**

that the two discussed protected action by Lindsay is mere unsupported speculation. *See Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020) (in Title VII retaliation case, although circumstantial evidence showed that employee Bayne had "an opportunity to tell" his superior, Hogan, about another employee's protected activity, the evidence did not show that she actually did: "The meeting between Bayne and Hogan is not itself evidence of Hogan's knowledge. Without more[,] . . . evidence of Bayne's opportunity to tell is not a substitute for evidence that she did so."); *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 257–58 (5th Cir. 2009) (court rejected as too speculative the argument by plaintiff that the supervisor who fired him was aware of his EEOC filings; plaintiff had pointed out that managers generally were made aware of EEOC filings by employees they supervise and that his supervisor had discussed his potential firing with the railroad's director of labor relations); *Wickman v. Henderson*, 19 F. App'x 740, 742–43 (10th Cir. 2001) (where supervisors testified that they were unaware of plaintiff's protected activity before firing her, judgment as a matter of law for the defendant was appropriate despite evidence that the supervisors had met with someone who did have knowledge of the protected activity). Lindsay is correct that sworn testimony denying knowledge (no matter how saintly the witness) is not dispositive at the summary-judgment stage. But she has the burden of proving that those who acted against her had knowledge of her protected activity; and the evidence that Donner and Hermsen had meetings is support for only speculation, not a finding, that Donner had knowledge.

Next, Lindsay argues that because Donner mistreated her, or "singled her out," Donner must have known of the protected activity. Aplt. Br. at 19. Lindsay claimed that Donner "hostilely argued with her in a way that she did not with any other department head." Aplt. Reply Br. at 8. She contends that this mistreatment was consistent with Donner's habit of "fir[ing] people who complained about her." Aplt. App., Vol. II at 329. But the mistreatment of Lindsay was not unique. Caldwell, Hermsen, and Donner's supervisor all gave sworn statements that they had observed or received complaints of Donner's rudeness toward subordinates. We think it unreasonable to make the inferential leap that the rudeness to Lindsay must have been based on knowledge of protected activity.

As for Lindsay's contention that Donner fired people who complained about her, the defendants acknowledge that some employees were fired as a result of a reorganization and that some of those who were fired had complained about Donner. But Lindsay did not undertake the more careful analysis required by our case law— namely, identifying specific similarly situated employees who were treated differently despite engaging in the same conduct. *See, e.g.*, *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1153–54 (10th Cir. 2008). In the present context Lindsay would have had to identify otherwise similarly situated employees who were fired or not fired depending on whether they had criticized Donner. This she has not done. Even if we were to characterize Lindsay's efforts on behalf of Lee as constituting criticism of Donner (which would be quite a stretch in itself), it is gross speculation to say on this

record that Donner must have known that Lindsay had defended and assisted Lee because Donner fired Lindsay and Donner fired only critics.

Lindsay has further argued that because DPS's legal department had, by the time of her termination, "been investigating Lee's Charge for weeks," one can draw "the inference that Donner had indeed been informed by DPS management or legal counsel of the nature of Lindsay's involvement in Lee's Charge." Aplt. App., Vol. II at 324. But the factual predicate of this argument—that the legal department knew of the charges filed by Lee—finds no support in the record. As the district court pointed out, "Plaintiff cite[d] to no evidence in the record showing that the legal department knew of or was responding to Lee's charges." *Id.* at 490.

Lindsay also contends that retaliation must have been the motive for her firing because (1) the investigation that led to her termination was "procedurally irregular," Aplt. Br. at 27, (2) the stated reasons for her termination were pretextual, and (3) "pretext alone allows an inference of unlawful acts on the part of an employer," *id.* But Lindsay's attack on the bona fides of the termination process falls flat. The investigation was initiated because of a complaint from a former employee, not by someone who would have had knowledge of Lindsay's protected activity. The investigator, Caldwell, interviewed the relevant people (including Lindsay) and reviewed the relevant documentation. Although Lindsay baldly asserts that "[n]o legitimate investigation into [O'Bayley's] work or lack of work was ever even undertaken," Aplt. Br. at 28, she points to no material request for follow-up that Caldwell ignored and her briefs on appeal do not point to any specific gaps in the

Page **12**

investigation. Perhaps most striking, Lindsay does not explain why a phony investigation that ignores exculpatory information would exonerate her on a charge of racial discrimination, the most serious charge against her. Lindsay's only legitimate attack on the investigation arises from evidence apparently found during this litigation that indicates O'Bayley had not actually been overcompensated. But the documentation on that issue was complicated. And this court has repeatedly declared that an error in fact-finding that led to action against an employee is not in itself sufficient to establish pretext. *See, e.g.*, *Piercy v. Maketa*, 480 F.3d 1192, 1202 (10th Cir. 2007) ("If the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue, we cannot conclude they were a subterfuge for discrimination or, likewise, retaliation."); *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1321 (10th Cir. 2017) ("[The] determination that Dr. Hiatt had entered ethical grey territory as a result of that investigation—even if mistaken—does not suggest pretext."); *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1268–69 (10th Cir. 2004) (employer's good faith belief "would not be pretextual even if the belief was later found to be erroneous").

Finally, Lindsay points out that only two weeks passed between Lee's filing her second charge of discrimination and Donner's firing of Lee's main witness, Lindsay; and she contends that this temporal proximity "raises an inference of prohibited retaliatory motive," Aplt. Br. at 35. This is an argument we have rejected in the past. As we said in *Singh v. Cordle*, although "a plaintiff may show a causal connection by presenting evidence that the temporal proximity between the protected

Page **13**

conduct and the materially adverse action justifies an inference of retaliatory motive[,] . . . a plaintiff who seeks to show causation in this manner still must present evidence that the decisionmakers *knew* of the protected conduct." 936 F.3d 1022, 1043 (10th Cir. 2019) (cleaned up).

To sum up, the gist of Lindsay's argument is that she was a highly regarded employee who was ostensibly discharged for minor infractions, so one can infer that the real reason for discharge must have been her protected activity. The inference, she contends, is so strong that it can overcome the absence of any other evidence that the decisionmakers knew of her protected activity. When we step back a moment, however, and take an overview of her claim, its flaws become clear. To begin with, she has utterly failed to show that anyone at DPS knew that she had assisted Lee in bringing her discrimination charges with the EEOC and CCRD—one of her two alleged protected activities. Lee testified that she had not told anyone before Lindsay was fired, and her charges said only that she had received information from one of the (seven) members of the second panel. Lindsay's retaliation claim therefore must rely on an inference that a member of the second panel reported to someone involved in her termination about what she said at that panel—her other alleged protected activity. But what is it that she said? According to Lindsay, she objected to negative comments about Lee from another member of the panel (without calling them discrimination) and then said things favorable to Lee. Lindsay utterly fails to explain why what she said would so outrage the powers that be that they would go to great lengths to get rid of her. Perhaps the member of the panel who made the objected-to

Page **14**

remarks would take some offense at being criticized; but Lindsay has not argued that this person was involved in the termination. One cannot reasonably infer from Lindsay's firing that Donner must have known of the remarks at the panel meeting that accused Donner of nothing.

We therefore conclude that Lindsay has failed to present sufficient evidence from which a reasonable person could infer that Donner, or anyone on whom she relied in deciding to terminate Lindsay, was aware by the time of Lindsay's termination that she had engaged in protected activity. We have addressed each of her arguments and found each to be too speculative. Even if we cumulate all the speculation, the argument remains speculation. We therefore agree with the district court that Lindsay has failed to prove causation and we affirm the grant of summary judgment on all claims.

## III.   CONCLUSION

We **AFFIRM** the judgment of the district court.