**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**October 1, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

_____

ANTHONY ASPAAS,

    Plaintiff - Appellant,

v.

XAVIER BECERRA, Secretary of the
U.S. Department of Health and Human
Services,

    Defendant - Appellee.

No. 23-2157
(D.C. No. 1:21-CV-00500-LF-KK)
(D. N.M.)

_____

### ORDER AND JUDGMENT[*]
_____

Before **HOLMES**, Chief Judge, **HARTZ**, and **ROSSMAN**, Circuit Judges.
_____

Anthony Aspaas appeals the district court's entry of summary judgment in favor of his former employer on his claim that the employer retaliated against him in violation of Title VII of the Civil Rights Act of 1964. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. BACKGROUND[1]

From June 14, 2014, until January 22, 2016, Mr. Aspaas was employed by the United States Department of Health and Human Services ("HHS") as a Supervisory Clinical Nurse in the Specialty Clinic at the Chinle Comprehensive Health Care Facility ("Chinle") in Chinle, Arizona. His direct supervisor was Charlene West. For the last half of 2014, Ms. West rated his performance as "Achieved Outstanding Results." Aplt. App., vol. II at 204.

### A.    Ms. West counsels Mr. Aspaas in April 2015

On March 19, 2015, two Chinle staff members complained to Ms. West that during a staff meeting, Mr. Aspaas referred to a health technician as an "idiot" who did not know what she was doing. When Ms. West counseled him, he admitted having called the health technician an idiot.

Also on March 19, 2015, Mr. Aspaas told one of the employees he supervised, LuAnn Robertson, that she could not attend an emergency management/hazmat training session because she was pregnant. The next day, Ms. Robertson emailed Ms. West that she felt Mr. Aspaas was discriminating against her because of her pregnancy. According to Mr. Aspaas, Ms. West yelled at him and overruled Mr. Aspaas's decision. On March 26, Mr. Aspaas emailed Ms. West that he felt her decision regarding this matter was reverse discrimination against him.

---

[1] In addition to a retaliation claim, Mr. Aspaas also asserted claims of sex and disability discrimination. He does not appeal the entry of summary judgment on those claims, so we limit our discussion of the facts to those most relevant to his retaliation claim.

Based on these two incidents, Ms. West met with Mr. Aspaas on April 16, 2015. She gave him a written warning and explained that it was the start of "progressive disciplinary action." *Id.*, vol. I at 111; *see also id.* at 64–66 (notes of discussion with Mr. Aspaas). According to Mr. Aspaas, Ms. West again yelled at him and had security present.

**B.    Mr. Aspaas speaks with an EEO counselor and emails Chinle's CEO**

In June 2015, Mr. Aspaas spoke with an Equal Employment Opportunity ("EEO") counselor, Jim Benally, regarding Ms. West's treatment of him in the wake of the "idiot" and Luann Robertson matters. According to testimony Mr. Aspaas provided at a hearing before an administrative judge in the Equal Employment Opportunity Commission ("EEOC"), he told Mr. Benally, "I need some intervention. Somebody needs to talk to her. Somebody needs to say, Hey, look you know, let me do my job. So don't undermine me. Don't override me. Let me run that clinic like I'm supposed to . . . ." *Id.*, vol. II at 49 (Tr. at 176:13–18). At a deposition, Mr. Benally testified that Mr. Aspaas never named his supervisor or mentioned discrimination but claimed his supervisor was preparing to propose disciplinary action against him because he "was making comments, teasing and joking with female workers under his direct report" who had "complained about him." *Id.*, vol. I at 164:1-7. Mr. Benally further testified that Mr. Aspaas did not say he wanted to file an EEO complaint and that Mr. Benally did not "tell any Agency management officials at Chinle" about his discussion with Mr. Aspaas. *Id.* at 165:2–6. Mr. Aspaas received no response from Mr. Benally.

3

On July 9, 2015, Mr. Aspaas emailed Ms. West's supervisor, Chinle CEO Ron Tso, requesting a meeting to "address [a] complaint regarding [his] overtime/comp time." *Id.* at 166. Mr. Aspaas said he was a "Vietnam Veteran" and that since his April 16 meeting with Ms. West, she had "single[d] [him] out, ignored, accused, harassed and avoided [him], and discriminated against [his] gender." *Id.* He pointed out that Ms. West had shouted at him and called security on him. Ms. West, who was not copied on the email and could not recall if Mr. Tso gave her a copy, said Mr. Tso discussed only the overtime issue with her. Mr. Tso eventually met with Mr. Aspaas and approved the overtime. Sometime after that, Ms. West got "upset" with Mr. Aspaas because he had gone "over her head," which she considered "insubordination." *Id.*, vol. II at 55 (Tr. at 202:7–11).

## C.    Ms. West removes Mr. Aspaas from his supervisory role

Mr. Aspaas supervised a health technician named Martha Laughter. He rated her performance a level 2, which meant she was partially achieving expected results. On July 8, 2015, Ms. Laughter requested a meeting with Mr. Aspaas and her union representative to discuss the rating. In advance of this meeting, Mr. Aspaas emailed three coworkers and asked them to provide written support for "verbal complaints of deficiency" he had of Ms. Laughter's performance. *Id.*, vol. I at 118. He also disclosed Ms. Laughter's performance rating and noted that some of her certifications had expired.[2]

---

[2] As discussed below, Ms. West was unaware of this email until after she learned, on September 3, that Mr. Aspaas had filed a formal EEO complaint.

On August 12, the head of the podiatry clinic, Dr. Matthew Bookwalter, emailed Mr. Aspaas, Ms. West, and another physician in the podiatry clinic, Dr. McQueen Suen, that Ms. Laughter could not treat patients without formal certification. On August 14, Dr. Bookwalter emailed the same recipients again, requesting that Ms. Laughter be removed from the podiatry clinic staff due to her lack of a current health technician license or certification. About an hour later, Mr. Aspaas emailed the same group complaining that Ms. Laughter was not assisting Dr. Suen. Dr. Bookwalter replied a few minutes later, reiterating that Ms. Laughter could not work in the podiatry clinic until she provided documentation of an active license or certification.

The same day, Ms. West removed Ms. Laughter from her duties in the podiatry clinic. She also met with Mr. Aspaas and told him that based on his failure to address or document the situation with Ms. Laughter, she was removing him from his supervisory role until she completed a review of his actions, and she reassigned him to clinical nursing duties in the emergency room and urgent care departments. Ms. West had security present at this meeting. According to Mr. Aspaas and another supervisory clinical nurse present at the meeting, Evelyn Malone-Stephens, Ms. West allegedly yelled at him again, called him mean and a loser, said she wished she had not hired him, and told him he would "get what he deserved, and she was going to treat him like he treated" Ms. Laughter, *id.*, vol. II at 107 (Malone-Stephens Tr. at 47:14–15); *see also id.* at 56 (Tr. at 205:1–3) (Mr. Aspaas testifying that Ms. West said he was "going to get what [he] deserved").

Mr. Aspaas worked ER shifts on August 19 and 20. On August 20, he submitted a note dated August 20 from the Department of Veterans Affairs indicating he had "received medical care" and although he was "able to return to work," he should be "[e]xcuse[d]" from work from August 21 until September 8, 2015. *Id.*, vol. I at 142. The note provided no further details. Ms. West approved this leave request but informed Mr. Aspaas that before he returned to work, and pursuant to the leave policy regarding extended sick leave (more than three days), he was required to provide medical documentation for his absence that contained "information necessary for planning work or for determining that the approval of continued leave is appropriate." *Id.* at 143 (italics and internal quotation marks omitted). She also informed him that he was required to submit "medical clearance by [his] provider." *Id.*

## D.     Mr. Aspaas files an EEO complaint

Meanwhile, on August 19, Mr. Aspaas contacted the EEO office. An EEO counselor interviewed him on August 26. On August 31, Mr. Aspaas sent an email to Mr. Tso with the subject "Hostile work environment." *Id.* at 176. He informed Mr. Tso that he had started the EEO process and that Ms. West's "retaliatory behavior help[ed] trigger [his Post-Traumatic Stress Disorder ("PTSD")] by forcing [him] to work in ER." *Id.* Attached to the email was a letter in which Mr. Aspaas asked for an investigation and reinstatement of his supervisory position "due to [Ms. West's] reckless, abusive, bullying, discriminating authority and her retaliatory

6

behavior." *Id.* at 175.[3]  According to Ms. West, she first learned of Mr. Aspaas's EEO complaint on September 3, 2015, when she was interviewed as part of the EEO process.

### E.    Mr. Aspaas is absent without leave

Mr. Aspaas requested further leave using a check-box "Excuse Slip" from HHS's "Counseling Services" that stated only that he should be excused from work from September 8 to September 18, 2015.  *Id.* at 144.  Ms. West approved this leave, but again informed Mr. Aspaas of the documentation and clearance requirements set out in the leave policy.  Mr. Aspaas then took previously approved annual leave from September 21 to October 2, 2015.

Mr. Aspaas reported to work on October 5.  The supervisory nurse on duty instructed him that before he could resume working, he needed to provide a medical note clearing him for return to work.  Mr. Aspaas submitted a note dated October 8, 2015, which stated only:  "<u>No</u> work until cleared by MD." *Id.* at 147.

On October 14, Ms. West sent Mr. Aspaas a certified letter stating he should either contact her immediately, return to work by October 19, or resign.  Mr. Aspaas responded on October 22, summarizing his leave to date, listing the names and phone numbers of his providers, and stating he was "still under Doctor's Care until further instructions." *Id.* at 149.

---

[3] Although the letter was dated August 16, 2015, Mr. Aspaas later admitted he had emailed the letter to Mr. Tso on August 31, 2015.  *See* Aplt. App., vol. I at 155, ¶ 2.

Mr. Aspaas remained absent from work without submitting any further leave requests.  During Mr. Aspaas's absence, Ms. West learned of his July disclosure of Ms. Laughter's performance rating and that in a June email he had invited a potential job applicant to meet with him offsite.

## F.    Mr. Aspaas's employment is terminated

By letter dated December 3, 2015, Ms. West proposed terminating Mr. Aspaas's employment because (1) he was absent without leave ("AWOL") from October 5 to November 13, 2015; and (2) he engaged in unacceptable conduct by (a) failing to address Ms. Laughter's expired certification; (b) disclosing Ms. Laughter's performance rating to individuals without a need to know; (c) inviting the potential job applicant to meet with him offsite; and (d) failing to contact Ms. West or her designee to request leave from October 5 to December 3, 2015.  She also explained that the medical documentation he had submitted was unacceptable because it contained no diagnosis, prognosis, or light-duty restriction that might enable a management decision.  In Mr. Aspaas's favor, Ms. West noted she had considered, among other things, that he had twenty-three years of federal service with no "prior disciplinary actions" and "otherwise acceptable performance."  *Id.* at 151.

Mr. Aspaas responded to the proposal by letter dated December 11.  He denied disclosing Ms. Laughter's performance rating, stated he had never met with the potential job applicant (but did not deny he had invited her to meet offsite), provided his own account of events leading up to the removal of his supervisory duties, and

attributed his absences to being a veteran suffering from PTSD. He also claimed he had submitted his diagnosis, prognosis, and light-duty restrictions.

By letter to Mr. Aspaas dated January 15, 2016, Mr. Tso accepted Ms. West's proposal, sustained the unacceptable-conduct and AWOL charges, and terminated Mr. Aspaas's employment effective January 22, 2016.

## G.    Mr. Aspaas files this action; district court enters summary judgment

Mr. Aspaas filed a formal complaint with the EEOC, which was denied on March 3, 2021, after an administrative hearing. He then filed this action against the HHS Secretary, asserting claims of sex discrimination and retaliation under Title VII and failure to accommodate his disability in violation of the Rehabilitation Act, *see* 29 U.S.C. § 794(a). The Secretary moved for summary judgment, which the district court granted.[4] On appeal, Mr. Aspaas challenges only the ruling on his retaliation claim. The district court determined that Mr. Aspaas could not establish a prima facie case of retaliation but that, to the extent he may have, he had not shown the proffered reasons for removing him from his supervisory role or his termination were pretextual. We will discuss the district court's ruling in more detail in our analysis of the issues raised on appeal.

## II.  STANDARD OF REVIEW

"We review a district court's decision granting summary judgment *de novo*, resolving all factual disputes and drawing all reasonable inferences in favor of the

---

[4] The parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

non-moving party." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006). Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. ANALYSIS

### A. General Title VII retaliation standards

Under Title VII's anti-retaliation provision, an employer may not discriminate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The first of these clauses is referred to as the "opposition clause," and the second clause is referred to as the "participation clause."

"To prevail on a Title VII retaliation claim, a plaintiff must establish that retaliation played a part in the employment decision . . . ." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008). A plaintiff lacking direct evidence of retaliation may attempt to satisfy this burden by relying on the "three-part *McDonnell Douglas* framework[5] to prove that the employer's proffered reason for its decision is a pretext for retaliation." *Id.* at 1225. Under that framework, a plaintiff must first establish a prima facie case of retaliation by showing "(1) [he]

---

[5] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Mr. Aspaas proceeded under the *McDonnell Douglas* framework.

engaged in protected activity; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action." *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008) (internal quotation marks omitted).  "To satisfy [the causal-connection] element, a plaintiff must show that the individual who took adverse action against [him] knew of the employee's protected activity." *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) (internal quotation marks omitted).

If the plaintiff can make the prima facie showing, the defendant "must offer a legitimate, nonretaliatory reason for its employment action." *Vaughn*, 537 F.3d at 1150 (brackets and internal quotation marks omitted).  If the defendant satisfies this burden, then the plaintiff "bears the ultimate burden of demonstrating that [the defendant's] proffered reason is pretextual." *Id.* (internal quotation marks omitted).

Mr. Aspaas's retaliation claim concerns two adverse employment actions—his removal from his supervisory role and the termination of his employment.  We first address the removal of his supervisory role and then the termination of his employment.

## B.    Removal from supervisory role

Mr. Aspaas contends he engaged in two instances of protected activity before Ms. West removed him from his supervisory role in August 2015:  (1) his June 2015 meeting with EEO Counselor Benally and (2) his July 9 email to CEO Tso.[6]  Because

---

[6] In the district court, Mr. Aspaas also alleged a third instance of protected activity—his March 26 email to Ms. West stating he felt her decision that

11

we disagree that these events were protected activity, we neither consider nor address his arguments regarding whether Ms. West was aware of these activities before removing Mr. Aspaas from his supervisory position and whether the temporal proximity between his July 9 complaint to Mr. Tso and the August 14 removal of his supervisory duties is, standing alone, sufficient to establish causation.

### 1. Communication with EEO Counselor Benally

As noted, Mr. Aspaas met with EEO Counselor Benally sometime in June 2015. The district court determined this meeting did not qualify as protected activity because Mr. Aspaas did not tell Mr. Benally that he wanted to file an EEO complaint. Quoting his own testimony, Mr. Aspaas argues that he asked Mr. Benally to "'look into the situation'" because he "'needed intervention,'" Aplt. Opening Br. at 42 (quoting Aplt. App., vol. II at 49 (Tr. at 176:12-14)), and claims he "brought discrimination to EEO Officer Benally . . . and nothing was done," *id.* at 53. We are not persuaded that this meeting amounts to protected activity under either the participation clause or the opposition clause in § 2000e-3(a).

The participation clause protects an employee who has "made a charge" or otherwise "testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. § 2000e-3(a). Plainly, Mr. Aspaas's

---

Ms. Robertson could attend the hazmat training was reverse discrimination against him. The district court determined that email did not amount to protected activity. Mr. Aspaas raises no appellate challenge to that ruling, so we do not address it. *See Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020) ("Issues not raised in the opening brief are deemed abandoned or waived." (internal quotation marks omitted)).

meeting with Mr. Benally did not amount to making a charge of discrimination. Despite the conclusory *statement* in Mr. Aspaas's brief that he complained to Mr. Benally of discrimination, there is no *evidence* he did so such that the meeting might be considered participation in the internal EEO process. According to Mr. Benally's undisputed testimony, Mr. Aspaas did not say he wanted to file an EEO complaint and did not mention discrimination. *See Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 49 & n.9 (2d Cir. 2012) (suggesting that a federal employee's complaint of discrimination to an EEO counselor could qualify for protection under the participation clause if required by federal regulation to exhaust administrative remedies).

Under the opposition clause, "[p]rotected opposition can range from filing formal charges to voicing informal complaints to superiors." *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004). "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII]." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). Thus, "[g]eneral complaints about company management . . . will not suffice." *Id.* "A plaintiff need not convince the jury that his employer had actually discriminated against him; he need only show that when he engaged in protected opposition, he had a reasonable good-faith belief that the opposed behavior was discriminatory." *Hertz*, 370 F.3d at 1015–16.

13

The evidence in this case does not support a reasonable inference that Mr. Aspaas conveyed to Mr. Benally a concern that Ms. West had engaged in any conduct violative of Title VII. As noted, Mr. Aspaas recounted only that he asked Mr. Benally to look into the situation with his supervisor regarding Mr. Aspaas's supervision of his clinic. And according to Mr. Benally, Mr. Aspaas did not say he wanted to file an EEO complaint or mention discrimination; he reported only that his supervisor was preparing to propose disciplinary action against him because he "was making comments, teasing and joking with female workers under his direct report" who had "complained about him." Aplt. App., vol. I at 163:22–163:3, 163:6–7. Thus, there is no genuine dispute of material fact that the meeting with Mr. Benally was not protected opposition to discrimination. Consequently, Mr. Aspaas cannot establish a prima facie retaliation case based on that meeting.

**2.  July 9 email to Mr. Tso**

In the July 9 email to Mr. Tso complaining about the denial of overtime and comp time, Mr. Aspaas said that since the April 16 meeting with Ms. West, she had "single[d] [him] out, ignored, accused, harassed and avoided [him], and discriminated against [his] gender." *Id.* at 166. Mr. Aspaas argues the district court erroneously concluded the email did not qualify as protected conduct when the court stated that his "informal and generic complaints about 'reverse discrimination' are not subject to the protections of Title VII." Aplee. Suppl. App. at 85. The court, however, made this observation in connection with its participation-clause analysis, not its opposition-clause analysis, concluding that Mr. Aspaas could not show

14

protected activity under the participation clause because his "first formal contact with an EEO counselor [was] on August 19, 2015, *after* he was removed as supervisor." *Id.* at 86. And it is opposition, not participation, that can be shown by informal complaints. *Compare Hertz*, 370 F.3d at 1015 ("Protected *opposition* can range from filing formal charges to voicing informal complaints to superiors." (emphasis added)), *with Littlejohn v. City of N.Y.*, 795 F.3d 297, 316 (2d Cir. 2015) ("[T]he participation clause only encompasses participation in formal EEOC proceedings; it does not include participation in an internal employer investigation unrelated to a formal EEOC charge." (internal quotation marks omitted)).

In its opposition-clause analysis, the district court noted Mr. Aspaas had not explained in the July 9 email "how Ms. West had discriminated against him based on his gender, and Mr. Tso interpreted the single sentence regarding harassment and discrimination as being tied to the denial of overtime." Aplee. Suppl. App. at 87 (citation and internal quotation marks omitted). The court also concluded there was no evidence Ms. West was aware of Mr. Aspaas's allegations of harassment and discrimination.

We conclude that the July 9 email does not express a "reasonable good-faith belief that the opposed behavior was discriminatory." *Hertz*, 370 F.3d at 1016. This standard has subjective and objective components. *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997); *see also Crumpacker v. Kan. Dep't of Human Res.*, 338 F.3d 1163, 1171 (10th Cir. 2003) (holding that a plaintiff cannot "maintain a retaliation claim based on an *unreasonable* good-faith belief that

15

the opposed conduct violated Title VII"). To meet the standard, "[a] plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented." *Little*, 103 F.3d at 960; *accord Crumpacker*, 338 F.3d at 1171. One rationale for the objective component is that "Title VII was designed to protect the rights of employees who in good faith protest the discrimination they believe they have suffered and to ensure that such employees remain free from reprisals or retaliatory conduct," not "to 'arm employees with a tactical coercive weapon' under which employees can make baseless claims simply to 'advance their own retaliatory motives and strategies.'" *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 890 (7th Cir. 2004) (quoting *Spadola v. N.Y.C. Transit Auth.*, 242 F. Supp. 2d 284, 292 (S.D.N.Y. 2003)).

Mr. Aspaas may have believed in good faith that Ms. West's refusal to approve overtime was due to gender discrimination, but he has not shown that the belief was objectively reasonable in light of the record facts. Mr. Aspaas highlights that the email "pointed out that he had been screamed at and that West had called security on him without basis." Aplt. Reply Br. at 6. But there is nothing inherently discriminatory about a supervisor raising her voice. And the evidence bearing on Ms. West's reasons for having security present at meetings with Mr. Aspaas does not suggest a generalized discriminatory animus against men but instead reveals a concern for her own safety. In an affidavit, Ms. West stated that Mr. Aspaas "is a big man and I was fearful of him too. I had security in case anything happened because I

16

did not know how he would react." Aplt. App., vol. II at 190, ¶ 43; *see also id.*, vol. I at 58 (Ms. West again stating in her affidavit that she was "actually fearful of him because he is a big man"). Similarly, Ms. West testified at the administrative hearing that "[t]o some extent," she "was fearful" of Mr. Aspaas, and "there were times when [she] thought he might attack [her]. He's a veteran also." Aplt. App., vol. II at 162 (Tr. at 93:18–21). Ms. West was then asked: "What about if he was a big female? Would you have been fearful of a female supervisor you might have?" *Id.* (Tr. at 94:15–17). She answered: "I have had a couple of females who have made me fearful." *Id.* (Tr. at 94:18–19). Moreover, when Mr. Aspaas testified about the meeting he had with Mr. Tso to discuss the overtime complaint expressed in the July 9 email, Mr. Aspaas never mentioned gender discrimination. *See id.* at 55 (Tr. at 201:8 to 202:4). He also testified that Ms. West was later "mad" because he "went over her head," not because he reported gender discrimination. *Id.* (Tr. at 202:7–11).

In short, there is no record evidence from which a reasonable inference may be drawn that Ms. West shouted at Mr. Aspaas or had security present for the April 16 meeting due to a discriminatory animus against men. Because Mr. Aspaas has not created a triable fact issue on the objective reasonableness of the belief expressed in the July 9 email that Ms. West had discriminated against him on account of his gender, we conclude the July 9 email does not constitute protected opposition to discrimination. Thus, Mr. Aspaas cannot establish a prima facie retaliation case based on that email.

## C.    Termination

### 1.  The district court's ruling

In his motion for summary judgment, the Secretary argued that Mr. Aspaas could not show causation regarding his termination through temporal proximity because there was a three-month gap between September 3, 2015, when Ms. West became aware he had filed a formal EEO complaint, and December 3, 2015, when she proposed his termination.  *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (explaining that a "three-month period, standing alone, is insufficient to establish causation").  The district court agreed, although it relied on the even longer four-month period between when Ms. West first learned of the EEO complaint (September 3) and the effective date of Mr. Aspaas's termination (January 22, 2016).  In the alternative, the court determined that the Secretary had provided legitimate, non-retaliatory reasons for terminating Mr. Aspaas's employment—his shortcomings as a supervisor and, regarding the AWOL charge, his failure to follow proper leave-requesting procedures, to provide a sufficient medical explanation for his extended absence, and to obtain a medical clearance to return to work.  Finally, the court concluded Mr. Aspaas had not shown these reasons were pretextual.[7]

---

[7] The district court referred to its discussion of Mr. Aspaas's other claims and concluded he had not shown that any of the reasons his employment was terminated were pretextual.

## 2. Mr. Aspaas has waived his challenge to the temporal-proximity ruling

In his opening brief, Mr. Aspaas argues that the relevant time period is much shorter than the district court calculated. He claims its runs from Ms. West's September 3 awareness of his EEO activity to sometime in late September or early October, which is when Ms. West admittedly contacted the Employee Relations/Labor Relations department "about proposing Mr. Aspaas's removal," Aplt. App., vol. II at 156 (Tr. at 55:9). We could assume that Ms. West's admission is sufficient to reduce the temporal gap to, at most, six weeks. That period can, by itself, establish causation. *See Anderson*, 181 F.3d at 1179 ("[A] one and one-half month period between protected activity and adverse action may, by itself, establish causation."). But we do not see where Mr. Aspaas raised this argument in the district court. In his response to the Secretary's motion for summary judgment, the only temporal-proximity argument he raised concerned the removal from his supervisory role.

"When a party fails to raise an argument below, we typically treat the argument as forfeited." *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019). "And when an appellant raises a forfeited argument on appeal, we will reverse only if the appellant can satisfy our rigorous plain-error test." *Id.* But Mr. Aspaas has not acknowledged his failure to raise his new theory in the district court let alone argued for plain error. "When an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain

error or otherwise." *Id.* "Under such circumstances, the failure to argue for plain error and its application on appeal surely marks the end of the road for an argument not first presented to the district court." *Id.* (ellipses and internal quotation marks omitted).

We may apply these principles of forfeiture and waiver even where, as here, the opposing party does not argue forfeiture or waiver in its brief. *See United States v. McGehee*, 672 F.3d 860, 873 n.5 (10th Cir. 2012). We elect to do so. The Secretary squarely presented the temporal-proximity issue in his motion for summary judgment, but Mr. Aspaas did not alert the district court to any concern about which date to use in analyzing temporal proximity. In these circumstances, we decline to excuse Mr. Aspaas's forfeiture. He therefore has waived the argument and cannot demonstrate causation through temporal proximity.[8]

### 3. Pretext evidence does not establish causation

Where the plaintiff cannot demonstrate temporal proximity, he "must offer additional evidence to establish causation." *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1182 (10th Cir. 2006) (internal quotation marks omitted). As

---

[8] In his reply brief, Mr. Aspaas urges us to apply what he calls the "unique circumstances" test set out in *Wells v. Colorado Department of Transportation*, 325 F.3d 1205, 1217 (10th Cir. 2003), and find temporal proximity based on the fact that he was "on leave during most of this period before [his] termination." Aplt. Reply Br. at 12. We see no reason to depart from the general rule that we "do not consider arguments raised for the first time in a reply brief," *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 676 n.9 (10th Cir. 2016), particularly considering that Mr. Aspaas did not present this theory in the district court and has not argued plain error, *see Leffler*, 942 F.3d at 1196.

Mr. Aspaas notes, we may consider evidence of pretext in assessing the causation element of a prima facie case of retaliation under Title VII. *See Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003). Pretext can be shown "by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-retaliatory reasons." *Vaughn*, 537 F.3d at 1153 (brackets and internal quotation marks omitted).

Mr. Aspaas argues he demonstrated pretext regarding each of the reasons Ms. West gave for terminating his employment: (1) he failed to address Ms. Laughter's expired certification and shared her performance rating with others; (2) he invited a potential job applicant to meet offsite; and (3) he was AWOL and failed to request leave.

### a. *Conduct with respect to Martha Laughter*

Mr. Aspaas faults Ms. West for acting too quickly when she removed Ms. Laughter from her position and Mr. Aspaas from his supervisory role the same day that Dr. Bookwalter asked for Ms. Laughter's removal. This argument ignores context. Dr. Bookwalter first raised the issue in his August 12 inquiry into Ms. Laughter's certification status, stating that "[i]f she does not have some kind of formal certificate she cannot treat patients." Aplt. App., vol. I at 129. Two days later, when he asked by email that Ms. Laughter be removed from the podiatry clinic, Mr. Aspaas responded not by removing her, but by sending an email complaining that

21

she was not helping the other podiatrist, Dr. Suen.  Only then did Ms. West take matters into her own hands and remove Ms. Laughter from the clinic and Mr. Aspaas from his supervisory duties.  Based on this sequence of events, a reasonable factfinder could not find pretext in the timing of Ms. West's actions.

Mr. Aspaas also claims he told Ms. West he had helped Ms. Laughter fill out the required application and offered to pay for her testing, only to find out later that she had not applied.  And when he reported that failure to Ms. West and asked for her help, Ms. West allegedly "ignored his request."  Aplt. Opening Br. at 46; *see also* Aplt. App., vol. II at 53 (Tr. at 195:16–23) (Mr. Aspaas testifying to same).  All this apparently occurred sometime before August 12.  But as Mr. Aspaas himself testified, his attempt to help Ms. Laughter came after he had already brought the certification issue to Ms. West and she asked him to "work with [Ms. Laughter]" on it.  Aplt. App., vol. II at 51 (Tr. at 188:9–10).  Thus, whether Ms. West should have done more rather than rely on Mr. Aspaas does not suggest that basing her termination proposal on the perceived shortcomings in Mr. Aspaas's handling of the matter was pretextual.[9]

Mr. Aspaas posits that Ms. Laughter did not need certification to perform her job.  We find this proposal rather specious given Mr. Aspaas's own efforts to help Ms. Laughter secure certification and Dr. Bookwalter's insistence that she needed to

---

[9] Mr. Aspaas's testimony on this issue also undermines his argument that pretext can be found in Ms. West's admission that she did not ask him for information regarding the certification issue before proposing termination.  According to his testimony, she already knew of his efforts to help her get certified.

be certified. In any event, this argument raises nothing more than a potential factual mistake, and "an error in fact-finding that led to action against an employee is not in itself sufficient to establish pretext," *Lindsay v. Denver Pub. Sch.*, 88 F.4th 1323, 1330 (10th Cir. 2023).

As to Ms. Laughter's performance rating, Mr. Aspaas points out that Ms. Laughter had already discussed it with other employees, so he did not think he was sharing any confidential information. But in his response to Ms. West's termination proposal, he did not offer this explanation. Rather, he denied he had shared the rating at all and suggested that "[i]f it was sent, it was sent by . . . Ms. Laughter." Aplt. App., vol. I at 154, ¶ A.2. Given that Ms. West and Mr. Tso had in their possession the email in which Mr. Aspaas had in fact shared the rating, reliance on this rationale is not indicative of pretext.

### b. *Invitation to job applicant to meet offsite*

Regarding Mr. Aspaas's invitation to the job applicant to meet offsite, he contends Ms. West erroneously thought he was the selecting official and the applicant was applying for a position in his specialty clinic. He also claims Ms. West was aware of emails where the applicant stated she in no way was willing to work for Ms. West. However, in his response to the termination proposal, Mr. Aspaas did not contend that the applicant had been applying for a different department or disabuse Ms. West of the notion that he was not the selecting official. He instead stated that although he had "selected her two times in a row" for the position, Ms. West had overridden those decisions because she did not like the applicant. *Id.* at 154, ¶ A.3.

23

In light of that response, any misunderstanding Ms. West and Mr. Tso may have had about the situation was understandable and not indicative of pretext.

### c. AWOL/failure to request leave

Mr. Aspaas contends that the statement in Ms. West's termination proposal that he had had no contact with her since October 5 was wrong and suggests pretext. He points out that he left a medical note for her on October 8 and sent the October 22 letter, which summarized his leave status; stated that as of October 8 he was "still under Doctor's Care," *id.* at 149; and asked her to contact him with any questions. But what Ms. West said was he had not contacted her since October 5 "*to request leave.*" *Id.* at 150 (emphasis added). Mr. Aspaas does not suggest this was untrue. Thus, Ms. West's statement does not show pretext.

Mr. Aspaas takes issue with Ms. West for not "pointing out any shortcomings in his medical documentation or helping this Veteran who they knew had a PTSD episode get what he needed for [Leave Without Pay ("LWOP")]," particularly in light of the fact that he had twenty-three years of federal service. Aplt. Opening Br. at 48. He argues that because Ms. West approved the first two leave requests, her failure to accept the documentation he provided for the later times he was out "could show pretext," as could her "failure to consider LWOP due to his satisfactory explanation through medical notes." *Id.* at 49–50.

None of these arguments withstands scrutiny.  HHS's leave policy is set out in Instruction 630-1 of its Human Resources Manual.[10]  It requires employees to "submit evidence as required by their leave-approving official to support approvals of sick leave," Instr. 603-1-50.C.1, and authorizes the leave-approving official to "require medical documentation for extended absences, e.g., over three consecutive days," Instr. 603-1-50.C.1.a.  The policy defines "[m]edical documentation" as "that which is . . . sufficiently specific for the leave-approving official to make a reasonable decision that the employee was incapacitated to perform the duties of his/her position."  *Id.*  The purpose of requiring medical documentation for periods of extended sickness "is to obtain information that is necessary for planning work" and to determine whether "the approval of continued leave is appropriate (e.g., the health care provider's prognosis of when the employee will be able to return to work; what limitations, if any, the physician will temporarily place on the employee's activities; and, if applicable, what other work the employee could perform)." Instr. 603-1-50.C.3.

Despite approving Mr. Aspaas's first two leave requests, Ms. West informed him that he still needed to submit medical documentation justifying the leave.[11]  The

---

[10] The full policy is found here:  https://www.hhs.gov/sites/default/files/hr-resource-library-630-1.pdf.

[11] Ms. West conditionally approved the second leave request *after* she knew he had initiated the EEO process, which further detracts from Mr. Aspaas's theory that charging him as AWOL was retaliatory.  This is so even if, as Mr. Aspaas observes, his EEO counseling report was not formally submitted to the EEO office until September 15.

note accompanying his first leave request stated, without any reason, that he should be excused from work until September 8. For his second leave request he submitted a check-box form stating only that he "[s]hould be excused from work from 9/8/15 to 9/18/15," again with no reason. Aplt. App., vol. I at 144. His next submission set out only the conclusory statement, "No work until cleared by MD." *Id.* at 147. And his final attempt at submitting medical documentation was his own email stating he was "still under Doctor's Care until further instructions." *Id.* at 149. We fail to see anything pretextual in Ms. West's view that none of his submissions complied with the leave policy or that the charge of AWOL was justified rather than granting him LWOP.

Mr. Aspaas's reliance on supervisory clinical nurse Malone-Stephens's testimony does not persuade us otherwise. Ms. Malone-Stephens testified that with a doctor's statement, an employee may be LWOP, but not AWOL. The district court observed that her testimony was contrary to the plain language of the policy, which provides: "An AWOL charge *may* be changed to an appropriate type of leave if the leave-approving official determines that the employee has satisfactorily explained the absence or presented acceptable documentation." Instr. 630-1-30.E.2 (emphasis added).

Mr. Aspaas further argues that although he may not have formally told Ms. West that he had PTSD until December 2015, she must have known about the diagnosis before then because (1) it was described in his EEO complaint and at the interview the EEO investigator performed on September 3; (2) Ms. West stated in an

26

affidavit that she learned about it from the emergency room supervisor who refused to let Mr. Aspaas return to work on October 5 without medical clearance; and (3) Mr. Aspaas told Mr. Tso about it in two writings in August 2015. Mr. Aspaas contends that in light of this putative knowledge, Ms. West should have awarded him LWOP instead of charging him with AWOL. As the district court pointed out, however, this argument overlooks that, under the leave policy, LWOP is required only when "[a]n employee, who is a disabled veteran, presents an official statement from a medical authority that medical treatment is required in connection with the disability," and "[t]he employee must give prior notice of the period during which absence for treatment will occur." Instr. 603-1-30.B.1.a. Mr. Aspaas did not meet either of these requirements, and therefore he cannot demonstrate pretext based on Ms. West charging him with AWOL rather than awarding him LWOP even if she was aware of his PTSD diagnosis as early as September 3.[12]

The final argument we address is Mr. Aspaas's contention that pretext may be inferred from Ms. West's retaliatory attitude as evidenced by certain conduct—

---

[12] Mr. Aspaas cites 5 C.F.R. § 630.405(a) for its directive that "[a]n agency may consider an employee's self-certification as to the reason for his or her absence as administratively acceptable evidence, regardless of the duration of the absence." He argues that this option creates a jury question regarding Ms. West's motive in requiring him to provide medical documentation in accordance with the leave policy. He also cites a definition of "medical certificate" in 5 C.F.R. § 630.201(b) and claims the October 8 doctor's note stating, "No work until cleared by MD," Aplt. App., vol. I at 147, qualifies under that definition. We fail to see where he raised either argument in the district court, and he has not argued for plain error review on appeal. He has therefore waived appellate review of these arguments. *See Leffler*, 942 F.3d at 1196.

yelling at him, demeaning him, accusing him of insubordination, unreasonably fearing him because he was a veteran, banning people from talking to him, and ignoring his medical excuses. We are not persuaded. "When the plaintiff relies on circumstantial evidence to establish that the employer was motivated by retaliatory animus, that circumstantial evidence must be tied directly to the retaliatory motive." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1000 (10th Cir. 2011) (internal quotation marks omitted). "Thus, the plaintiff must present evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged retaliatory attitude." *Id.* (brackets and internal quotation marks omitted). None of the conduct Mr. Aspaas points to "directly reflects" a motive of retaliating against him for filing his EEO complaint; indeed, much of it predates September 3, when Ms. West became aware of his EEO complaint. Instead, the conduct shows only that Ms. West was frustrated with his actions or, in the case of his medical excuses, that she did not find them adequate.

## IV.  CONCLUSION

We affirm the district court's judgment.

Entered for the Court

Jerome A. Holmes
Chief Judge